David O. Boehm, J.
On this application for bail, decision was reserved and a hearing ordered. (People v. Terrell, March 4, 1970.) It was there said: “ Although the constitutional guarantees against excessive bail (N. Y. Const., art. I, § 5; U. S. Const., Eighth Amendment), do not require bail as of right in felony cases and the court is given considerable discretion in capital cases, (Code Crim. Pro., §§ 552, 553), nevertheless such discretion is not ‘ pure or unfettered ’ and ‘ calls for a fact determination, not a mere fiat.’ (People ex rel. Lobell v. McDonnell, 296 N. Y. 109, 111; cf. People ex rel. Klein v. Krueger, 25 N Y 2d 497).” (See, also, People v. Bach, 61 Misc 2d 630; People ex rel. Shapiro v. Keeper of City Prison, 290 N. Y. 393.)
The defendant is charged with the crime of murder in that on November 23, 1969 between 5:00 and 5:30 a.m., he shot one Robert Haynes in a single family dwelling at No. 24 Churchlea Place in the City of Rochester. The victim died within several days after being shot.
Factors to be determined as a consideration for the denying or granting of bail are (a) the nature of the offense; (b) the *674 penalty which may be imposed; (c) the probability of the willing appearance of the defendant or his flight to avoid punishment; (d) the pecuniary and social position of defendant and his general reputation and character; (e) the apparent nature and strength of the proof as bearing on the probability of his conviction. (People ex rel. Gonzalez v. Warden, 21 N Y 2d 18, 25, cert. den. 390 U. S. 973.)
The District Attorney argued preliminarily that bail should not be granted, regardless of whether or not the defendant favorably met the suggested standards. However, the District Attorney failed to produce either at the motion for bail or at the hearing which followed, any facts or law to sustain his position. Apparently he relies for support of his position upon nothing more than traditional practice. Although the defendant has the burden of proof in a proceeding such as this one, the District Attorney totally failed to controvert the facts adduced at the hearing. After the defendant rested, the District Attorney also rested and submitted nothing in evidence to contradict the testimony as to the defendant’s generally good reputation for peaceableness and honesty in the community and that he is a family man with a good record of employment, although given adequate opportunity to do so.
Consequently, as to the facts, the court would have been obliged to depend solely upon the evidence produced by the defendant were it not for the assistance of the Monroe County Probation Department which conducted an investigation pursuant to the court’s request. As to its conclusions of law, the court is limited solely to the product of its own research and that of the defendant. The District Attorney’s assistance, by his unvarying and inflexible emphasis upon the past, has been of historical value only. However, as the Appellate Division of our department, in a different 'context, has only just pointed out again, his duty goes somewhat further. (People v. Holcombe, 34 A D 2d 728.)
At the hearing, the defendant produced as witnesses, Herbert T. Thornton, Jr., the president of. a firm of private employ-men consultants, Forrest Cummings, a neighbor of the defendant for 9 years, who has known him for 16 years, and A. Casper Imbary, the defendant’s landlord who has been in the building and real estate investment business for 56 years and who, neither racially nor socially, is a member of the inner city group to which the defendant belongs. In addition, the defendant himself took the stand and testified.
The uncontested evidence convinces this court that the defendant has been the sole support of his family which presently *675 consists of Ms wife and a 21-year-old son who is suffering from a serious physical disability. His neighbor, Mr. Cummings, who lives directly across the street and is not related to him either by blood or marriage, testified that for the many years he has known the defendant, he is “ one of the nicest persons I know ’ ’; that he has loaned the defendant money from time to time which was always promptly repaid; that he knows the defendant’s reputation for honesty, integrity and peaceableness, and that the entire neighborhood “ speaks nicely of him.” Indeed, this neighbor has such a high regard for the defendant that he testified under oath he is willing to use real estate which he owns as securtiy for a bail bond. Mr. Cummings further testified he has never seen the defendant drunk.
Mr. Imbary, defendant’s landlord, testified he has known the defendant since July, 1961 when the defendant first came to see him about renting the apartment where he has since lived; that as the landlord he visited his property as least once a month and made it a practice to speak to the tenant upstairs about any problem with the tenant downstairs. Mr. Imbary stated he knows the defendant’s reputation for integrity, honesty, peaceableness and for his family associations and that it was “ Unusually favorable ”; that the defendant was in the “ top range ” of the tenants in the witness’ investment properties ; that the defendant always paid his rent punctually; that the witness never had any complaint from the upstairs tenant with respect to defendant’s occupancy of the apartment below in the entire nine-year period defendant has lived there.
The defendant’s own testimony disclosed that he has worked as a laborer for a large local construction corporation for 12 years and that except for illness or injury, worked steadily and without absences. Indeed, it appears that if released on bail, the defendant’s job is still available for him. Defendant’s other ties in the community include an older married daughter, a brother and a cousin.
The defendant has been living in the Rochester area for 22 years. In cross-examination the defendant admitted that he had been convicted of disorderly conduct in 1961, but explained that it arose out of an occurrence when he tried to stop a fight between two other men and was arrested, together with one of the men involved, after he had taken him into his car to take him home. Cross-examination also brought out evidence of a prior arrest in 1957 on charges which were dismissed before trial.
At least since 1961, and until November 23, 1969, the defendant has led a quiet, hard-working steady and nonviolent life. *676 He is well regarded by his friends and neighbors and those who associate with him. His family is dependent upon him— so much so that since the defendant’s incarceration his family’s needs have had to be provided by welfare. If permitted to be released on bail, the defendant would return to his former job and take up again the support of himself and his family.
The probation investigation, conducted and reported by skilled, trained professionals with a totally objective view, was most helpful to the court. The information in the report, if anything, strengthened the proof in favor of the defendant. It disclosed that defendant had worked for the former Reed Glass Company in Rochester from the summer of 1947 until August of 1956 when the company ceased operating. On October 15, 1956 the defendant began employment with his present employer, where he worked until the date of his arrest on November 23, 1969.
Mr. James Spitz, vice-president and co-owner of the company where defendant is presently employed, stated that as far as he knew, the defendant had an excellent work record with his company and promised that, barring a possible future strike, a job would be waiting for him upon release. Mr. David Delinder and Mr. Gene Neszlenyi, both construction superintendents for this firm, stated that the defendant had worked under them and both agreed that he had been a good worker with a good attendance record and had never needed close supervision. Mr. Delinder stated that the defendant was a mild man who never showed any temper nor any evidence of drinking on or before a working day.
Mrs. Helen Rivers Terrell .stated that she and the defendant have been married for about 23 years, and that the relationship between her husband, herself, and their son had always been a good one. She described her husband as a quiet man who had always been willing to help his wife out with her work around the house. At the time of the interview by the probation officer, Mrs. Terrell was suffering from a broken ankle which was encased in a heavy cast, thereby incapacitating her. Mrs. Terrell revealed that the family was forced to go on welfare after her husband was incarcerated in November, 1969.
The probation report notes that on May 7, 1957, defendant was charged with assault, third degree, by a Martha Harris, the wife of Willie Terrell, the defendant’s younger brother. The charge was subsequently withdrawn by the District Attorney. Defendant claims that the charge had originated from a family argument which did not involve the threat or use of any physical force.
*677 The report further shows that on November 23, 1961 the defendant was arrested and charged with intoxication, and disorderly conduct. The charge of intoxication was dismissed and defendant received a six-month suspended sentence for the disorderly conduct charge. According to the defendant, he had taken a friend who had imbibed at a party into his car, when the police arrived and arrested both the defendant and his friend in an apparent mix-up. Defendant stated that he felt the six-month suspended sentence was due to the fact that he had no lawyer to represent him. With respect to the present charge of intentional murder, the defendant advised the investigating officer that he was only protecting himself from assault and possible injury from the deceased.
The probation investigation also included speaking to a number of other persons associated with the defendant in the past. They are: Mr. Robert Angello, a general laborer with the Werner Spitz Construction Company, Inc., for the past 30 years, who said defendant was one of the mildest men he had ever known and a good worker as well; Mr. William Bullock, a former landlord of defendant in Rochester, who described the defendant as an excellent tenant, quiet, and one who always paid his rent on time; and Mr. Willie Terrell, a younger brother of the defendant, living in Rochester, who stated that his brother had always been a “family man”, quiet and a person who usually kept to himself.
The probation report concluded: “ In reviewing the numerous factors involved in this case, the testimonial of both black and white members of the community towards the defendant’s character appears impressive. The subject’s employment history and marital .relationship demonstrate the defendant’s ability and past history of successfully shouldering social responsibility. * * * The defendant has exhibited an attitude of deference and cooperation towards this officer without any signs of bitterness or denial of at least partial guilt for the crime he has been charged with. This factor coupled with the promise of a job immediately following his release by the subject’s former employer as well as the obvious financial and emotional need of the defendant’s family all point towards bail release consideration.”
In addition to the excellent and prompt investigation conducted by the probation department, the court also had the benefit of the psychiatric evaluation preformed at the court’s request by the skilled medical staff of the Monroe County Mental Health Clinic. In his report, Dr. David J. Barry, Acting Director of the Clinic, states:
*678 ‘ ‘ I found no evidence of mental retardation, psychosis, paranoid thinking, or indications of significant impulsivity. Mr. Terrell was a very mild mannered man who spoke in a very quiet voice. He asserted that he had shot a man in self-defense, that he hoped to be able to prove this, and to be able to be once again a free man in the community, gainfully employed, and caring for his family. He spoke of sorrow at the death of the man whom he shot but spoke as if he had no alternative. He stated that he had never had any enemies, and that when a lady friend had told him a few weeks before the shooting that that particular man had it in for him, that he had not taken it seriously.
‘ ‘ In view of the above observations, coupled with the excellent history and reputation of this man, it seems likely that he is as good a risk as you’ll find on anyone under such a serious charge.”
Nevertheless, the District Attorney urges the court to refuse bail under any circumstances, giving as one reason that the crime was of a violent nature and a gun was used, thus indicating the defendant’s dangerous and violent propensities. This, however, was undoubtedly taken into consideration by the Rochester City Court when the defendant was originally arraigned. At that time the victim, although badly injured, was not dead and bail was set and met, apparently without objection by the District Attorney at that .time, in the sum of $1,000. Yet the defendant represented at that time just as much a danger to the community as he does now, regardless of whether the victim was alive then or dead today. The danger to the community is to be gauged by the nature of the criminal act and by the defendant’s record and reputation, not by the victim’s survival. Indeed, were the defendant a menace to society, he would be most dangerous to those who live nearest to him, yet his own neighbor is prepared to stake his own property' to release the defendant. Furthermore, the defendant’s record in the community belies such a nonspecific and otherwise unsupported prognosis.
The District Attorney further urges the court to consider that if bail is allowed, this will be the first time this has been done in this county in a case involving a defendant charged with murder. To allow bail now, it is asserted, would fly in the face of long-established practice afid precedent. However, if history is to be a guide, then data regarding bail release in prior crimes of homicide should be studied. If the court’s information is correct, the past eight years reveal the following bail dispositions:

*679

Of course, what the District Attorney’s argument overlooks is that we are today dealing with a totally new Penal Law which has been in effect only since September 1, 1967. Today, the crime of murder is punishable by death in only two instances. (Penal Law, § 125.30.) Before 1967 murder was a capital offense in a great many cases. (Old Penal Law, § 1044, subd. 1; § 1045-a.) Therefore, the inducement to flee the jurisdiction before 1967 was activated by the very impelling fear created by the nature of the punishment. Man’s strong instinct for self-preservation and the resulting compulsion to jump bail had to be taken into consideration by the courts when the question of bail arose. Therefore, although the Legislature, in its wisdom, permitted the release on bail of a defendant charged with a crime punishable with death i( Code Crim. Pro., § 552), the burden nevertheless fell upon the courts to consider man’s natural drive to preserve his own life, and to rule accordingly. However, under the old law, the courts did not automatically deny bail in every case. (People v. Rezek, 25 Misc 2d 705; and for a more recent pronouncement, see People v. Bach, 61 Misc 2d 630, supra.)
That same situation no longer exists today. Since 1967 the death penalty, except for two very limited exceptions, neither of which applies here, is abolished. The penalty for murder today is a prison sentence for an indeterminate term with a maximum of life imprisonment. As a practical matter, however, the term could run as low as 15 years, the same as that for a conviction of assault, first degree, or burglary, second degree, or grand larceny, first degree, or robbery, second degree, or forgery, *680 first degree. No one would dispute that people charged with such offenses have been released on bail and- in numerous, if not most, instances, the District Attorney has not opposed such applications. Yet many of the defendants involved in these charges represented, by their depraved, deliberate criminal conduct, much more of a danger to the community than the defendant here can be reasonably accused of. Accordingly, the allowance of bail in this case can .in no way be regarded as a break with the long-established tradition of the past. It is not the practice which has changed, but the Penal Law.
This is not to say that bail must be allowed as a matter of course in every homicide case. The possibility of flight from the jurisdiction or the threat posed to the safety of the community are important, determining-criteria which, in an appropriate ease, would compel the denial of bail in any amount. ( See People v. Melville, 62 Misc 2d 366; The Case of the Dangerous Defendant — a Study and Proposal, Fourteenth Annual Report, Judicial Conference of New York, p. 124 [1969]). “ [I]f a court determines that a defendant would be a threat if released prior to trial its duty is to remand him rather than set an extremely high bail.” (People v. Melville, supra, p. 374; see, also, Pretrial Release Standards, Approved Draft, 1968, American Bar Association Project on Minimum Standards For Criminal Justices, § 5.5, pp. 65, 66).
However, this clearly is not the situation here. The defendant has tangible ties in the law-abiding community. Even the circumstances involved in the charge now pending against him by no means point to a clear-cut conclusion of guilt. Indeed, the court has been informed by defense counsel that there will not be a plea in this case even if offered, because of the strength of the defense.
The defendant testified before the Grand Jury. The court has read the Grand Jury minutes. There is authority for the Magistrate to examine the minutes of a preliminary proceeding in a ease of homicide where there is an application for bail. (People v. Beigler, 3 Parker Cr. Rep. 316.) The defendant’s testimony and that of other witnesses, indicate strong issues involving questions of self-defense, lack of intent, accident, and the like.
It appears that friends and neighbors had dropped in earlier in the evening at the house where the shooting occurred. Some drinking had taken place. The owner of the house, Catherine Terrell, who is not related to the defendant, told the victim Robert Haynes and his brother, Hubert, to leave the house. When they refused to go, she went upstairs into her bedroom *681 and took therefrom a loaded .22 caliber revolver which belonged to her. The defendant, who had been in the upstairs bathroom, took the gun from her, and went downstairs. There was a quarrel and, in the melee, the victim was shot. The defendant did not attempt to flee, but remained at the house until arrested about one-half hour later.
The policy of the law favors the release of a defendant pending determination of his guilt or innocence. It justifies his detention before conviction only- if some legitimate purpose of the criminal process requires it. . (Pretrial Release Standards, Approved Draft, 1968, supra, § 1.1, p. 23.) Absent such legitimate circumstances, bail in an appropriate amount should not be denied.* “ Detained defendants are deprived of an opportunity to work to support themselves and their families, to help in the preparation of their cases and to demonstrate, if possible, that they are good risks for probation if convicted. The hardship to families is no doubt frequently substantial. The cost to the community in terms of welfare expenditures and maintenance of jail facilities is practically incalculable.” (Id., p. 24.)
The court is also obliged to consider that there is no right to appeal from its decision, if bail is denied. (Code Crim. Pro., § 566; People ex rel. Deliz v. Warden, 260 App. Div. 155.) Habeas corpus is the only remedy and then within a very narrowly circumscribed area. (People ex rel. Wasmund v. McCloskey, 16 Misc 2d 659.) As recently stated by the Court of Appeals, “ [T]he determination of the bail-fixing court will not be overturned unless there is the ‘ invasion of constitutional right,’ and not a ‘ difference of opinion ’ [citing cases].” (People ex rel. Klein v. Krueger, 25 N Y 2d 497, 500.) Within constitutional limits, this court has “ the sole nonreviewable discretion to fix or deny bail.” (id., p. 502).
The burden that rests upon the court to exercise its discretionary power only within the standards imposed by law is not a light one. It may not be applied arbitrarily, and where a bail application is opposed by the State, a hearing should be held and any decision to deny bail should be supported by a real showing of reasons therefor. (People ex rel. Shapiro v. Keeper of City Prison, 290 N. Y. 393, supra; People ex rel. Singer v. Corbett, 26 A D 2d 770.)
The court is satisfied by all of the evidence that the setting of bail in this case is appropriate. All of the People ex rel. *682 Gonzales v. Warden (supra) standards have been satisfactorily met.
At the hearing, the District Attorney informed the court that, if bail were allowed, he would refuse to make any recommendations as to the amount thereof. Accordingly, the court now proceeds to set bail, keeping in mind defense counsel’s request that it be fixed in an amount not exceeding $10,000, the net value of the real property which the defendant’s neighbor is prepared to place as security for a bail bond in that amount. Bail in any event should not be set in an excessive amount and should be no more than is necessary to guarantee the defendant’s presence at trial. (People ex rel. Lobell v. McDonnell, 296 N. Y. 109.)
The defendant’s application for bail is granted, and the amount of such bail, either in cash or bond, is set at $10,000. Upon meeting bail in the- amount fixed, the defendant is ordered released from custody pending trial.

For a most recent example of the right to bail for persons charged with first degree murder, see the recent rulings in Connecticut and New Jersey as reported in the New York Law Journal (March 26, 1970, p. 1, col. 6).