OPINION OF THE COURT
Reinaldo E. Rivera, J.
On November 21 and 22, 1995, on application by the People the court conducted a bail source hearing pursuant to CPL 520.30 to determine if the bail bond arrangement offered by defendant, or any feature thereof, .ought to be disapproved by the court as a violation of public policy.
BACKGROUND
Defendant was arrested on September 13, 1995 and charged in Kings County indictment number 11873/95 with sale and possession of drugs, possession of weapons and bribery.
At arraignment, bail was set in the amount of $150,000. Defendant proffered a bail bond written by the Frontier Insurance Company.
The People challenged the bond and requested a bail source hearing, as authorized by CPL 520.30, asking the court to scrutinize the collateral offered to the surety to indemnify the bond.
THE BAIL SOURCE HEARING
The controlling statute is CPL 520.30. This statute is silent with respect to the form, procedures, and initial and ultimate burdens, including that which is required to initiate or justify the court’s inquiry in cases where the District Attorney is chai *558 lenging the posting of a bail bond. In cases of cash bail, however, the statute does provide the procedures to initiate the inquiry.*
In the case at bar this court accepted the People’s points of argument, i.e., the nature of the crimes charged, the defendant’s relationship to the indemnitors contributing the collateral as suspiciously remote, the defendant’s ready access to cash, as sufficient to warrant close scrutiny of the bail package. Accordingly, the application for a bail source hearing was granted.
BURDEN OF PROOF
In the case of People v Esquivel (158 Mise 2d 720 [Sup Ct, NY County 1993]), the court, presented with the issue of burden of proof in a bail source hearing as one of apparent first impression, concluded that the ultimate burden by a preponderance of the evidence is appropriately placed upon the defendant.
That court reasoned that the defendant is uniquely suited to know the source of the bail funds and is therefore in a better position to provide the court with documentation relating to an indemnitor’s assets. Conversely, the defendant’s release *559 would be delayed and the purpose of bail would be frustrated if the prosecutor were required to investigate the source of the funds and property posted.
This court notes, incidentally, statutory and case law authority in support of the proposition that the ultimate burden of proof should properly rest with the defendant. Requiring the defendant to bear the burden is reasonable since it is the defendant’s burden in the first instance to persuade the court that bail should be granted. (See, People v Terrell, 62 Misc 2d 673 [Monroe County 1970].) This court finds itself in the position of having to fill in the gaps which presently exist in this statute. In doing so we are guided by restraint and do therefore cautiously refer to statutory language which does properly and logically relate to our facts. CPL 510.40 (3) requires the court to examine the bail posted to determine whether it complies with the order fixing bail. After an application for bail is granted and an amount set, the bail offered must comply with the requirements of the bail statute before it will be accepted by the court. (See, CPL 520.10, 520.15, 520.20.) If the bail does not comply with the order or if some factor or circumstance requires or authorizes disapproval thereof, the bail will be disapproved. It is appropriate that the burden remain upon the defendant to persuade the court that the proffered bail satisfies the statute and should be accepted.
This court finds that in a bail source hearing, it is consistent with logic, reason and practical necessity to require an initial showing by the People and an ultimate burden of persuasion by the defendant.
The People demonstrated reasonable cause to conduct this inquiry. The defendant bears the ultimate burden to persuade the court that the bail arrangement offered conforms with public policy requirements.
Having carefully observed and evaluated the demeanor and credibility of the witnesses, carefully examined any exhibits presented, listened to the arguments of counsel, read the memorandum of law submitted by the People and examined and analyzed the applicable statutes and case law, this court makes the following findings of fact and reaches the following conclusions of law:
FINDINGS OF FACT
The defendant called three witnesses, Adolph Johnson, Joseph McIntyre, and Allan Haber. The People called no witnesses.
*560 The bail bond at issue herein was posted by Frontier Insurance Company of New York in the amount of $150,000 on December 12, 1995. Frontier Insurance Company, as suretyobligor, was indemnified on the bond by the following collateral: (1) deed to a house located at 234 Warwick Street, Brooklyn, New York 11207, owned by Jacqueline Johnson and her father Adolph Johnson, appraised at $160,000 with an outstanding mortgage of approximately $73,000; (2) $40,000 in cash contributed by Joseph McIntyre comprised of loans in the amount of $28,000 from Basil Suarez, Jr. and $12,000 from Maxwell Nelson.
ADOLPH JOHNSON
Adolph Johnson is the stepfather of the biological mother of the defendant’s two infant children.
Mr. Johnson knows the defendant only through the defendant’s relationship with Mr. Johnson’s stepdaughter, Tanya. The record is devoid of testimony concerning the depth, nature and extent of the relationship between Mr. Johnson and his stepdaughter, Tanya.
Mr. Johnson has no personal relationship with the defendant at all. He testified that he deposited the deed to his home at his stepdaughter Tanya’s request and because the defendant’s older son was asking when his father would be out of jail.
Mr. Johnson testified that, until he was questioned on cross-examination on November 21, 1995, he had no idea that his wife Cinthia Brewer allegedly brought $20,000 in cash to the police station one-half hour after defendant called her on September 13, 1995.
JOSEPH MCINTYRE
Joseph McIntyre is the defendant’s uncle, the brother of defendant’s deceased father. His current income, totaling approximately $3,500 a month, is comprised of disability compensation from the Veterans Administration and a disability pension from the New York City Department of Correction. He owns a home in Virginia which has little or no equity. He has no credit cards.
When informed about the defendant’s current arrest, he agreed to assist his nephew in raising bail to secure his release from jail.
Mr. McIntyre borrowed $40,000 from two friends. The first loan, for $28,000, came from Basil Suarez, Jr. Mr. McIntyre *561 and Mr. Suarez have known each other since childhood. Mr. Suarez and Mr. McIntyre have made loans to each other in the past of $400 to $800. Mr. Suarez obtained $28,000 for this loan from a savings account and a CD. A letter of receipt for the $28,000 purportedly gives Mr. Suarez a lien of Mr. McIntyre’s house. There was, however, no discussion of repayment. No attorneys were, consulted. Mr. Suarez does not know the defendant.
Mr. McIntyre borrowed $12,000 from Maxwell Nelson. Mr. McIntyre and Mr. Nelson have known each other for 14 years. Mr. Nelson obtained $8,700 of the $12,000 loan from cash advances on his credit cards at 18.9% interest. The balance was withdrawn from his bank accounts. No discussion or agreement took place as to repayment of the loan, nor was the loan arrangement reduced to writing. Mr. McIntyre and Mr. Nelson have lent each other money in the past from $200 to $800. Mr. Nelson does not know the defendant.
ALLAN HABER
Mr. Haber is counsel to Frontier Insurance Company, the surety-obligor in the bail bond. He satisfied himself that there were no large infusions of money into the third-party indemnitors’ bank accounts. He testified he knew nothing about the defendant and had no information with respect to the charges against the defendant. His investigation was limited to an evaluation of the collateral and a determination as to its sufficiency as security against the bail bond. He testified that he was satisfied that the bail arrangement would exert sufficient pressure on the defendant to return to court.
QUESTIONS PRESENTED
Does CPL 520.30 empower this court to disapprove a bail bond when the circumstances surrounding the pledging of the collateral are so suspicious as to suggest the existence of a scheme to circumvent the purpose of the bail statute contrary to public policy?
Has the defendant met his ultimate burden by a preponderance of the credible evidence to convince and persuade this court that none of the features of the undertaking or bail bond package contravene public policy?
CONCLUSIONS OF LAW
CPL 520.30 permits the court to conduct an inquiry following the posting of a bail bond and justifying affidavits or the *562 posting of cash bail, to determine "the reliability of the obligors or person posting cash bail, the value and sufficiency of any security offered, and whether any feature of the undertaking contravenes public policy * * * The court may inquire into any matter stated or required to be stated in the justifying affidavits, and may also inquire into other matters appropriate to the determination.” (CPL 520.30 [1].) The statute lists six areas into which the court may inquire, without limiting the court to those matters, including "[t]he source of any money or property delivered or agreed to be delivered to any obligor as indemnification on the bond.” (CPL 520.30 [1] [c].)
The People claim that the circumstances surrounding the posting of the collateral are inherently suspect, contravene public policy, and warrant a court order disapproving the bail.
The defense maintains that the bail bond company is satisfied that the collateral indemnifying the bail bond comes from legitimate sources and that the People have not claimed otherwise. They contend that they have shown by a preponderance of the evidence that there was no coercion or conspiracy to evade bail statutes.
The scope of a CPL 520.30 inquiry in cases where a bail bond rather than cash is posted has been interpreted as properly limited to an examination of the qualifications and trustworthiness of the surety-obligor. (See, People v Martinez, 166 Misc 2d 605; Matter of Barnes v Cohen, 45 AD2d 837.)
In People v Martinez (supra), a bond for $15,000 was posted, of that sum $5,000 was supported by cash collateral from a source not satisfactorily explained. The court found that the People had not claimed or demonstrated any irregularity or unreliability on the part of the obligor, Frontier Insurance Company. The proper inquiry, the court stated, was not whether the cash contributed by the indemnitor came from a questionable source but whether the obligor was being used as a front to conceal illicit sources of bail.
The Martinez court cited Barnes v Cohen (supra) in support of the proposition that the inquiry is properly limited in cases where the obligor is a licensed insurance company. This court, however, recognizes that neither statute nor case law prohibits inquiry into the source of the collateral pledged to secure issuance of a bail bond. The statute expressly allows inquiry by the court into the source of collateral delivered to the obligor as indemnification on the bond. Furthermore, appellate case law has explicitly indicated that the hearing court’s scope of inquiry extends to investigation of the underlying indemnifica *563 tian on a bail bond. In Matter of Johnson v Crane (171 AD2d 537 [1st Dept 1991]), the First Department overruled its decision in Matter of Barnes v Cohen (supra) to the extent that Barnes held that the inquiry should be limited when bonds are posted.
It is this court’s opinion that, where no satisfactory explanation is given for the source of the collateral, inquiry into the source of the cash contributed as collateral is relevant and obligatory. Furthermore, this inquiry is appropriate even in the absence of a claim of irregularity on the part of the obligor and even if the cash constitutes only a portion of the collateral. The inquiry is essential. Without it the court cannot ascertain with any degree of certainty if an otherwise legitimate obligor is being unwittingly used as a front to conceal illicit sources of cash in contravention of New York State’s public policy. To limit the inquiry, merely to the good-faith auspices of the bail bond company as the Martinez case (supra) suggests, would defeat the purpose of the statute.
The interests of the bail bond company and the interests of the State do not necessarily coincide. The court and the surety share the ultimate objective of ensuring the defendant’s return to court for trial. However, they are motivated by separate and distinct concerns. The surety is a business enterprise. Its primary concern is to be indemnified if the bail is forfeited. It is under no obligation to ensure that the bail arrangement is consistent with the public policy of the State. The court’s primary concern is to ensure that the policy and laws of the State are upheld. The possibility that the State may be left in possession of undesirable funds or property if the defendant absconds is a secondary concern.
The court must probe the relationships between the indemnitors and the defendant and the motives of the indemnitors in pledging the collateral. These considerations, albeit not necessarily factors in the surety’s decision to issue a bond, are crucial from a public policy standpoint. In the opinion of this court, the proffered bail arrangement has failed to withstand the court’s close scrutiny of its relationships and motives.
Bail is set with a view to exert sufficient pressure on the defendant to ensure his return to court. The assumption is that a defendant would have an incentive to appear if the defendant’s • assets or those of a family member are put at risk if the defendant absconds. The bail arrangement here fails to meet the State’s public policy interest in this respect. Neither the defendant nor a close relative has put his own assets at risk. The *564 prospect of loss to the third-party indemnitors in this case is not likely to provide incentive for defendant to return.
A second essential public policy consideration is the motive of the indemnitors for putting up the collateral. The motive for a family member to pledge personal assets is readily understandable. But when virtual strangers put up substantial assets, the court is compelled to question their motives. (See, People v Esquivel, 158 Misc 2d 720, supra.)
The relationship between the defendant and Adolph Johnson is tenuous at best. Their only connection is the fact that the defendant is the father of his stepdaughter’s two children. Mr. Johnson has no personal relationship with the defendant "whatsoever”. In fact he rarely sees him. Nothing in the record indicates that Jacqueline Johnson knows the defendant. Mr. Johnson testified that Jacqueline Johnson signed the required documentation to turn over the deed because he told her the house was his and she had to do it.
I find Mr. Johnson’s testimony that he put up his home as collateral because the defendant’s children were asking when their father would be out of jail not worthy of belief. It is inherently suspect for Mr. Johnson to risk the loss of his home for a man he barely knows and has no reason to trust. This witness’s credibility is further weakened by his testimony that he was unaware that his wife allegedly brought $20,000 in cash to the police station at defendant’s request.
The defense maintains that Mr. Nelson and Mr. Suarez provided their substantial cash contributions on the basis of their close relationships with defendant’s uncle, Joseph McIntyre. However, the crux of the inquiry is on the relationship between the defendant and the persons putting up the cash not the relationship between Joseph McIntyre and his friends.
It is not credible for Messrs. Suarez and Nelson to risk such substantial financial loss for a person not known to them (except to the extent that they are aware that he is in jail with criminal charges pending against him).
Mr. McIntyre lacks the type of close relationship with his nephew that would justify confidence on the part of Messrs. Suarez and Nelson in Mr. McIntyre’s ability to ensure his nephew’s return to court. Mr. McIntyre does not know if his nephew finished school, he is not sure where he works, he is not familiar with the facts of his Virginia conviction, has never accompanied his nephew to court and does not spend any significant amount of time with him.
*565 Joseph McIntyre testified that both Mr. Nelson and Mr. Suarez know that his only income is from two disability checks. Yet they made loans to him of unprecedented proportions, with no discussion of repayment; no discussion of what would happen if defendant absconded; no discussion of interest and without consulting legal counsel. Significantly, neither Mr. Suarez nor Mr. Nelson testified at the hearing.
DECISION
The first question presented to this court is answered in the affirmative. CPL 520.30 does empower this court to disapprove a bail bond under the facts of this case. In my judgment, the circumstances surrounding the pledging of the collateral are as a matter of law, common sense and practicality so inherently suspicious as to suggest the existence of a scheme which would clearly circumvent the purpose of the bail statute.
The second question presented by this case is answered in the negative. The defendant failed to meet his ultimate burden by a preponderance of the credible evidence.
First, this court is not persuaded by the defendant’s contention that his relationship to the indemnitors is such as would ensure his return to court. Second, in my opinion, the bond company’s determination as to the legitimacy of the cash source is not binding on a court of law. Moreover, lack of evidence of coercion or conspiracy to evade the bail statute does not end the court’s mandate to scrutinize the bail bond features. In fact, this court finds from the over-all factual scenario presented that this arrangement violates public policy.
Too many features of this package do not pass muster: the failure by the indemnitors to adequately protect their investment against risk of loss; the absence of a relationship between Messrs. Suarez and Nelson and the defendant; the suspiciously vague relationship between the defendant and his uncle; the unconvincing relationship between the defendant and Mr. Johnson; the lack of any rational contractual agreement between Suarez, Nelson and the defendant’s uncle concerning the terms of the loans; and the witnesses’ over-all incredible testimony which in turn raises disturbing implications of possible wrongdoing.
Accordingly, in the exercise of my judgment and discretion and for the reasons herein stated, I conclude and find that this *566 bail package contravenes the public policy of the State. The bail is disapproved.
This shall constitute the decision and order of the court.

 To initiate an inquiry when cash bail is posted the District Attorney must first satisfy the court that there is reasonable cause to believe that the person posting cash bail is not in rightful possession of the funds or that the cash posted constitutes the fruits of criminal or illegal conduct. (CPL 520.30 [1].) This proviso regarding cash bail was added to the statute in the 1984 legislation which amended various sections of the CPL to remove statutory inequities between bail bond sureties and depositors of cash bail. However, this provision appears contrary to the obvious intent of the statute to allow the court a broad scope of inquiry. If the People were unable to meet this initial burden, the court would be precluded from further inquiry, even if there were indicia of public policy violations.
It is also worth noting that additional public policy issues may arise in cash bail situations that warrant inquiry by the court. A Nassau County Court was faced with the prospect of a movie studio seeking to post $2,000,000 bail in the Amy Fisher case. There was no reasonable cause to believe the money was obtained through criminal activity. Yet the lack of any financial or familial connection between the defendant and the source of the bail funds raised a legitimate public policy consideration. Since the purpose of bail is to ensure a defendant’s return to court, a bail source so remote from the defendant may well render the bail an ineffective guarantee of the defendant’s future appearance in court. (See, Abramovsky, Bail-Source Hearings, NYLJ, July 29, 1992, at 3, col 1.)
As an additional public policy consideration, it is also worth noting that statute prohibits the use of credit cards to post bail except for Vehicle and Traffic Law offenses. (CPL 520.10 [1] [i].) Since a significant portion of the cash collateral was obtained from credit cards, there is an indirect violation of statutory mandates.