Francis J. Bloustein, J.
One, Leroy Nicky Barnes, was indicted ¡by the Grand Jury of Bronx County charged with the crimes of murder and possession of a weapon, dangerous instrument and appliance as a misdemeanor. Bail was fixed in the sum of $100,000. A surety company bond in this sum was submitted to the District Attorney’s office together with an affidavit by the representative of the surety company averring the nature of the collateral that was posted as security for the bail bond and the name of the indemnitor and nature of the indemnification.
From such affidavit it appears that one Elder Sam Windham became the indemnitor (1) .by paying or agreeing to pay the premium of $3,030 for the bond, (2) by posting the sum of $50,000 in the form of two pertified checks, each in the sum of $25,000 drawn by iSam Windham as pastor of Samuel’s Temple Church *245 of God in Christ, Inc. of 75 West 125th Street, New York City, as collateral and (3) a confession of judgment for the difference between the collateral of $50,000 and the bond for $100,000 whereby Sam Windham, pastor of Samuel’s Temple confessed judgment for such sum.
The District Attorney, pursuant to CPL 520.30 questioned the sufficiency of the collateral and asked that the indemnitor named by the surety justify such security.
Putting aside and ignoring the fact for the time being that in the affidavit the indemnitor appears to have obligated himself individually as Sam Windham and accepting the statement from ¡Mr. Windham in his answers as a witness that the obligations of $3,030 premium, $50,000 in certified checks and a confession of judgment were in fact obligations of the church, let us consider whether the church acted properly within its powers under the Religious Corporations Law in obligating itself as indicated through Sam Windham, pastor. The testimony of this witness, a minister, was not only fuzzy, but reluctantly given.
The CPL provides for broad powers of inquiry by a Justice of this court and the District Attorney as to the sufficiency of collateral as security for a bail bond posted to insure the appearance of a defendant.
One might question the necessity for an inquiry such as this since a licensed surety company is posting the bail bond and in the event the defendant did not appear and the bail was forfeited, the bonding company would be responsible as surety.
However, the pastor who testified said he acted on behalf of the church. He claims, and he swore as a witness, that the church as indemnitor would be responsible to the surety in the sum of $103,030, the amount of the $100,000 bond and the promised premium of $3,030.
To this extent the church and its members, if such obligations were imposed upon it would have had this sum of $103,030 diverted from church purposes. This action is then contrary to the public welfare of the members of the church and in contravention of public policy (see CPL 520.30, subd. 1). In the interests of justice, this court finds this inquiry not only necessary, but in view of the disclosures, desirable.
The court has before it among the exhibits the surety company bond and affidavit of the surety naming the indemnitor and its obligations, the certificate of incorporation of Samuel’s Temple Church of God in ¡Christ, Inc., incorporated under the Religious Corporations Law and by-laws of Samuel’s Temple Church *246 of God in IChrist, Inc. Nowhere in the enumerated powers of the certificate of incorporation is the church empowered to post bail for anyone or to put up collateral for such ¡bail bond. If such action is undertaken, as it is claimed in this instance, it is outside the .scope of the corporate powers and ultra vires.
The indemnitor, testifying on behalf of the church, claims authority for its proposed obligations and relies on an alleged undated, uncertified by-law alleged to have been adopted by the general membership of the church (body. The alleged by-law, as is here pertinent, reads as follows: “ a meeting was called in reference to insurance * * * imprisonment * * * etc.”
‘ ‘ After many discussions the general membership wished to add an amendment to the present incorporation to include all of the things which have been discussed in this meeting, specifically adhering to its members:
“ 1) Insurance to cover each member
a- Seven lawyers with a specialty,
b- Missionary board (sickness),
c- Imprisonment (bail, lawyers, etc.) ”
The court is of the opinion that theby-law ” in effect authorizes an amendment to the certificate of incorporation by adding additional corporate powers. Beading the certificate of incorporation and the amended “¡by-law,” the court concludes the Samuel’s Temple is without authority to post security for a bail bond and may not assume such obligation. The by-laws of Samuel’s Temple ¡Church of iG-od in Christ, Inc., in article eight, reads in part as follows: 1 ‘ The Treasurer shall have the care and custody of all monies belonging to the organization and shall be solely responsible for such monies and securities of the organization. He shall cause to be deposited in a regular business bank or trust company a sum not exceeding $2,000.00 and the balance of the funds of the organization shall be deposited in a savings bank except that the Board of Directors may cause such funds to be invested in such investments as shall be legal for a savings bank in the State of [blank in original].”
Obviously, Elder Sam Windham was without authority to spend, pledge or have possession of any of the monies belonging to the church under these by-laws. It is clear that all moneys belonging to the church in excess of $2,000 should have been deposited in savings banks or invested in securities. This was not done since $50,000 alleged to be church money ,was deposited in the church account in order to secure two certified checks in part the sub ject of this inquiry.
*247 The testimony of the pastor of the church relating to the manner in which he secured the two certified checks, each in the sum of $25,000, totaling $50,000, creates many questions and suspicions and leaves much to be desired by way of answers. The pastor testified that at a meeting called for that purpose he was authorized to have a check certified in the sum of $25,000 on behalf of the church and to post such check as security for a bail bond. He further testified that between midnight of May 14 ,and 1:00 a.m. on May 15, 1974 he made seven telephone calls and reached five persons and that as a result of such calls he was again authorized to have certified an additional check in the sum of $25,000 on behalf of the church and to post such check as security for the bond.
The pastor further testified that in order to have the bank certify the two checks as noted, he had to deposit $50,000 in cash, ,$25,000 before the first check was certified on May 14, 1974 and $25,000 before the second check was certified on May 15, 1974. In both instances, the testimony discloses that the pastor had to deposit $25,000 in cash on two successive days to the church account, a total of $50,000 in cash. It is clear that the church had insufficient funds to its credit in its (bank account to have certified the two cheeks on May 14 and May 15, 1974 each in the. sum of $25,000. i
There is no affirmative proof that the cash deposited to the church account belonged to the church. The money was not recorded. There ,is considerable vagueness as to its ownership and sources. Problems might be raised as to ownership and claims might be made to such money by others.
An officer of the bank .testified that Sam Windham had two safe-deposit boxes at the bank. Both were contracted and kept in his name individually. He further testified that on Tuesday, May 14, 1974 he was called to a room in the space reserved for use by safe-deposit box holders and was asked to count a sum of money that was on a table in the room. He found bills in $5, $10, $20, $50 and $100 denominations and counted $25,020 in currency. Mr. Windham asked the bank employee to ¡deposit $25,000 to the church account against which deposit a check was certified in such sum. The next morning, May 15,1974, this same employee was again called to the room used by the holders of safe-deposit boxes and again was asked to count out $25,000 in currency from money lying on the table and from an open safe-deposit box on the table. Again he was asked to make a deposit in such sum to the church account and to have a check certified for $25,000. It is these two checks that have been offered by Sam Windham as collateral for the bail bond.
*248 There is no evidence of the ownership of the $50,000 in cash that was deposited against which the two certified checks were drawn from the church account. The bank officer testified that there were inadequate funds in the church’s account against which to certify $50,000 in checks.
These transactions arouse not only suspicion, but doubt as to the legal right of possession and the sources of this kind of cash in such denominations and sums. Claims against the church as indemnitor might arise because of the possible unauthorized use of the cash deposited to the church account. The interests of justice and the public policy would, in the court’s opinion, dictate that caution be exercised in permitting the use of these certified checks as collateral for the bond in this instance.
There is testimony that the church through the pastor posted $15,000 in September, 1973 as security for a bond for the same defendant, Barnes, on an indictment in ¡New Tork iCounty. Thus, if the security is justified in this case, the church would be obligated in the sum of $115,000 on behalf of one individual.
The pastor testified that ¡Samuel’s Temple operates some 41 child care centers, centers for senior citizens and educational programs in addition to the operation of its religious functions.
Section 5 of the Religious 'Corporations Law inveighs against the diversion of church funds for other than church purposes.
In the event Leroy Nicky Barnes f‘ jumps ” bail the church would have to make good in the sum of $115,000.
CPL 520.30 was obviously enacted to deal with a matter such as is now before this court for the exercise of its discretion in approving or disapproving the bond.
In the opinion of the court, the church was without authority to take the action it did through Pastor Windham in paying the sum ,'of $3,030 in cash or promising to pay such sum as a premium for a bail bond, posting $50,000 in certified ¡checks as collateral for a bail bond and executing a confession of judgment since such action is ultra vires.
Furthermore, it appears that it would be contrary to public policy and against the interests of the church members to permit the church to become an indemnitor to the extent of $100,000 and to such extent divert church funds from its authorized religious luses to what this court considers an improper and unauthorized use.
The court disapproves the bail bond under the authority of CPL 520.30.