Jasen, J.
The principal issue on this appeal is whether, in a murder prosecution, constitutional due process limitations are invaded by placing the burden of persuasion on a defendant with respect to the defense of acting "under the influence of extreme emotional disturbance” in order to reduce the homicide to the less culpable crime of manslaughter in the first degree.
The defendant, Gordon Patterson, and his wife, Roberta, had a highly unstable marital relationship, marked by recurring verbal arguments and physical assaults. As a result of one such incident, Roberta Patterson left her husband and instituted divorce proceedings. She also resumed dating John Northrup, a neighbor to whom she had been engaged prior to her marriage to the defendant. On December 27, 1970, the defendant, carrying a borrowed rifle, went to his father-in-law’s residence and observed his wife in a state of semiundress in John Northrup’s presence. Thereupon, he entered the house and shot Northrup twice in the head, killing him. The defendant confessed to the killing and, after a hearing, the confession was held voluntary and was admitted into evidence against him at trial. Defendant’s wife, an eyewitness to the crime, testified, over objection of defense counsel, that defendant fired two shots at the victim from close range. The defense *292 called 11 witnesses, including the defendant, who testified in great detail as to the defendant’s life and particularly that period of his life when he was married to Roberta Patterson. The defense at the trial was that the crime, if there was one, was unintentional. This was based on defendant’s version of events to the effect that the gun went off accidentally. Defendant also raised the affirmative defense that at the time of the alleged crime, he was acting under the influence of extreme emotional disturbance.
The court’s charge to the jury was based on the homicide provisions of the Penal Law (§ 125.25, subd 1, par [a][1]; § 125.20, subd 2).[2] The jury was instructed that "[t]he mere fact that the defendant fired a gun and thereby killed John Northrup does not, alone, suffice to establish his guilt of murder. The offense, as here charged, is an intent crime, and the law requires that it be proved beyond a reasonable doubt that the defendant acted intentionally.” The People were required to establish beyond a reasonable doubt that the defendant "intended, in firing the gun, to kill either the victim himself or some other human being.” To find intent, the jury had to conclude that the defendant had the "conscious objective to cause death, and that his act or acts resulted from that conscious objective.” The jury was cautioned that they "must not expect or require *293 the defendant to prove to your satisfaction that his acts were done without the intent to kill. Whatever proof he may have attempted, however far he may have gone in an effort to convince you of his innocence or guiltlessness, he is not obliged, he is not obligated to prove anything. It is always the People’s burden to prove his guilt, and to prove that he intended to kill in this instance beyond a reasonable doubt.”
With respect to the defense of extreme emotional disturbance, the court stated that the point of this evidence was to convince the jury, by a preponderance of the evidence, that "the defendant’s apparent intention to cause death, if you should find there was such, was not the result of a calm and calculating decision on his part, but that it was influenced by extreme emotional disturbance.” The court did not elaborate on the definition of "extreme emotional disturbance”, noting that the words are "self-evident in meaning”. However, the court cautioned that " 'extreme’ precludes mere annoyance or unhappiness or anger, but requires disturbance excessive and violent in its effect upon the defendant experiencing it.” As to the burden of proof, the court repeated its earlier instruction that "generally, the burden rests on the prosecution to prove beyond a reasonable doubt that the defendant is guilty of the crime charged. In this respect, the defendant’s raising of an affirmative defense makes a slight variation; although the rule still stands, generally, as to proof of the whole case, the burden of proving his affirmative defense—that indeed his acts were under extreme emotional disturbance which appears, reasonably, to be an explanation or excuse—is placed upon the defendant himself. The District Attorney is not required to deny this excuse.”
Finally, the court instructed the jury that "[t]he fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree”. The court went on to explain that "[t]his does not mean that the emotional disturbance exonerates the killer, or renders his killing guiltless. As long as he actually intended to cause the death of another person * * * the killing remains a crime, and remains a homicide, but is punishable in less severe manner than murder.” No objection was taken to the above-quoted portions of the court’s charge.[3]
*294 The jury found the defendant guilty of murder. The Appellate Division unanimously affirmed the judgment of conviction.
During the pendency of this appeal, the United States Supreme Court decided the case of Mullaney v Wilbur (421 US 684), wherein the court, passing on a Maine statute, held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.” (421 US, at p 704.) Defendant argues that Mullaney is controlling in this case and requires the striking down of sections 125.20 and 125.25 of the Penal Law to the extent that they require a defendant charged with murder to bear the burden of proving the affirmative defense that he acted under the influence of extreme emotional disturbance.
At the threshold we are confronted with two procedural issues. The first is whether the defendant has preserved a question of law for our review, and, secondly, even if he has, whether Mullaney should be applied retroactively to a trial already completed. The defendant’s constitutional contentions are based entirely upon a reading of the Mullaney decision. The jury was charged by the court on June 7, 1971, four years and two days in advance of Mullaney. At that time none of the various affirmative defenses contained in the 1967 revision of the Penal Law had yet been attacked on due process grounds. (See People v Laietta, 30 NY2d 68, cert den 407 US 923 [affirmative defense of entrapment].) In May, 1973, when the Appellate Division affirmed the judgment of conviction, there was no intimation that the homicide provisions might be vulnerable to serious constitutional challenge. In fact, the initial brief filed by appellant in our court did not raise a due process argument. The point was raised for the first time in a supplemental brief prepared after Mullaney was handed down.
Our court, with a narrow exception applicable in capital cases, is strictly a law court. A failure to object to a charge at a time when the trial court had an opportunity to effectively correct its instructions does not preserve any question of law that this court can review. (CPL 470.05, subd 2; People v *295 Robinson, 36 NY2d 224, 228.) Strict adherence to the requirement that complaint be made in time to permit a correction serves a legitimate State purpose. (Henry v Mississippi, 379 US 443, 447.) A defendant cannot be permitted to sit idly by while error is committed, thereby allow the error to pass into the record uncured, and yet claim the error on appeal. Were the rule otherwise, the State’s fundamental interest in enforcing its criminal law could be frustrated by delay and waste of time and resources invited by a defendant. While the review by this court is restricted, on the initial appeal to the Appellate Division, that court, with its broader powers of review, may consider claims of error, notwithstanding a failure to object. (CPL 470.15; People v Robinson, supra.)
There is one very narrow exception to the requirement of a timely objection. A defendant in a criminal case cannot waive, or even consent to, error that would affect the organization of the court or the mode of proceedings proscribed by law. (Cancemi v People, 18 NY 128, 138; People ex rel. Battista v Christian, 249 NY 314, 319.) In Cancemi, it was held that a defendant could not consent to being tried by a jury of less than 12 members. In People ex rel. Battista v Christian (supra), the court ruled that an information charging a defendant with an "infamous” crime was a nullity, despite defendant’s consent, where the State Constitution provided that infamous crimes could be prosecuted only by Grand Jury indictment. Thus, the rule has come down to us that where the court had no jurisdiction, or where the right to trial by jury was disregarded, or where there was a fundamental, nonwaivable defect in the mode of procedure, then an appellate court must reverse, even though the question was not formally raised below. (People v Bradner, 107 NY 1, 4-5; see People v Miles, 289 NY 360, 363-364.)
This traditionally limited exception has, on occasion, been given broader expression. In People v McLucas (15 NY2d 167), the defendant did not object to a comment by the trial court on his failure to testify. Our court ruled that "no exception is necessary to preserve for appellate review a deprivation of a fundamental constitutional right.” (At p 172.) Since the defendant’s right against self incrimination had been violated, the judgment of conviction was reversed.
As we view it today, the purpose of this narrow, historical exception is to ensure that criminal trials are conducted in accordance with the mode of procedure mandated by Constitu *296 tion and statute. Where the procedure adopted by the court below is at a basic variance with the mandate of law, the entire trial is irreparably tainted. As we stated nearly 50 years ago, "prosecutions must be conducted in substance and without essential change as the Constitution commands.” (People ex rel. Battista v Christian, 249 NY 314, 319, supra.) Defendant Patterson contends that the burden of proof on the issue of extreme emotional disturbance was improperly placed upon him. If the defendant’s argument is meritorious, his trial was not conducted in accordance with the procedure mandated by State law. Our law provides that "[n]o conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the defendant’s commission thereof.” (CPL 70.20.) If the burden of proof was improperly placed upon the defendant, defendant was deprived of a properly conducted trial, the distribution of the burden of persuasion being just as significant as the proper composition of the jury. Since the error complained of goes to the essential validity of the proceedings conducted below, we believe there is a question of law that our court should review.
We also note that prior to Mullaney, there was no doubt in this State that the extreme emotional disturbance affirmative defense was constitutionally valid. The defendant’s failure to object to a practice deemed valid in this State cannot deprive him of the right to attack that practice when an intervening Supreme Court decision calls that practice into question. (See O’Connor v Ohio, 385 US 92, 93; People v Baker, 23 NY2d 307, 317.) It is also significant that Mullaney was not handed down until well after the Appellate Division affirmed Patterson’s conviction. Were we not to treat appellant’s claim on the merits, Patterson would be deprived of a State forum in which his arguments could be heard. (Cf. People v Robinson, 36 NY2d 224, 228, supra.)
As to the second procedural issue, we hold that the defendant may assert a Mullaney claim even though his conviction predates that decision. We note that Mullaney was based on the Supreme Court’s earlier holding in In re Winship (397 US 358), a decision subsequently given retroactive effect. (Ivan V. v City of New York, 407 US 203.) Mullaney, like its progenitor Winship, should be given retroactive effect.
*297 We, therefore, turn to the merits of the defendant’s Mullaney claim. In our view, the New York law of homicide differs significantly from the Maine law struck down in Mullaney. We believe that the law of this State does not infringe the due process interests that Mullaney sought to protect.
To put the constitutional issues in focus, and to point up the differences between the law of New York and the common-law approach still followed in Maine, it is necessary to review the history and development of the law of homicide in this State. As a colony, and then in early Statehood, New York drew upon the English common law for its formulations of the homicide offenses. The crimes of murder and manslaughter, the only grades of culpable homicide known to the common law, were defined, and punished, in the same fashion as the English courts had for centuries. (1937 Report of NY Law Rev Comm, pp 540, 702-710.) In 1829, the Legislature codified, for the first time, the New York law of homicide. Murder was defined as a single, degreeless crime committed "[w]hen perpetrated from a premeditated design to effect the death of the person killed” [4] (1829 Rev Stat of NY, part IV, ch I, tit I, § 5.) On the other hand, manslaughter was divided into four degrees. A killing committed "without a design to cause death, in the heat of passion” was a manslaughter. If the killing was accomplished in "a cruel and unusual manner”, the crime was a second-degree offense; if the killing was accomplished by the use of "a dangerous weapon”, it was a third-degree offense. An involuntary killing, "by any weapon, or by means neither cruel nor unusual” in the heat of passion was manslaughter in the fourth degree. (1829, Rev Stat of NY, part IV, ch I, tit II, §§ 10, 12, 18.) As a result of this statutory change, a "clear-cut and decisive cleavage” was made between the crimes of murder and manslaughter, based upon the presence or absence of a "design to effect death”. (1937 Report of NY Law Rev Comm, p 544.) Moreover, where the common law had implied malice from the very fact of the homicide where a dangerous weapon had been used or the killing had been accomplished in a cruel and inhuman fashion, the New York revision deemed such acts to be manslaughter unless it could *298 be proved, that the defendant had a design to effect death. (At p 545.)
In 1860, following the early lead of Pennsylvania and Virginia (see Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Col L Rev 1425, 1445), the Legislature split the crime of murder into two categories, in an attempt to alleviate some of the harsh effects of capital punishment. Murder "perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing” was murder in the first degree and punishable by death. (L 1860, ch 410, §§ 1, 2.) Any other murder was in the second degree and punishable by life imprisonment at hard labor. (L 1860, ch 410, §§ 2, 6.)[5] In 1862, first-degree murder was redefined to include killings "perpetrated from a premeditated design to effect the death of the person killed”. (L 1862, ch 197, § 6.)
The two-tier murder offense was carried over into the Penal Code of 1881. The first-degree offense was committed when the killing was perpetrated out of "a deliberate and premeditated design to effect the death of the person killed”. (L 1881, ch 676; Penal Code, § 183, subd 1.) The second-degree offense was newly defined as a killing "committed with a design to effect the death of the person killed * * * but without deliberation and premeditation.” (L 1881, ch 676, § 184.) The punishments remained death and life imprisonment, respectively. (L 1881, ch 676, §§ 186, 187.) The four degrees of manslaughter were reduced to two. A killing, "[i]n the heat of passion, but accomplished in a cruel and unusual manner, or by means of a dangerous weapon” became manslaughter in the first degree, punishable by an imprisonment of between 5 and 20 years. (L 1881, ch 676, § 189, subd 2; § 192.) A heat of passion killing not committed by use of a deadly weapon or by a cruel and unusual means was a second-degree offense, punishable by *299 imprisonment of 1 to 15 years and/or a fine not in excess of $1,000. (L 1881, ch 676, § 193, subd 2; § 202.) The Penal Law of 1909, the immediate precursor of our present statute, retained the same definitions, with some alteration in the punishments to be meted out. (Former Penal Law, § 1044, subd 1; §§ 1045, 1046, 1048,1050, subd 2; §§ 1051, 1052, subd 2; § 1053.)
From this historical review, two points are made abundantly clear. First, New York, since its first statutory enactment in 1829, has always defined murder and manslaughter as separate and distinct offenses with punishments varying to fit the degree of the crime. Maine, on the other hand, has remained truer to the common law by defining but one generic category of felonious homicide, holding out a possibility of mitigation only in the form of punishment. Secondly, ever since 1829, New York has refused to imply malice from the act of killing, requiring the prosecution to establish, where it seeks to prove a murder, that the defendant possessed a design to effect death. Thus, in Stokes v People (53 NY 164), the court held that "[m]ere proof of the killing did not, as a legal implication, show” that the defendant committed the killing from a premeditated design to effect a human death. (At p 180.) This, again, is in contradistinction to the law of Maine struck down in Mullaney. (421 US, at p 686, n 4; State v Lafferty, 309 A2d 647, 965 [Me].) In Stokes, the court, in noting that the common law of England implied malice from the proof of killing only, cited the American case most often referred to for that principle, Commonwealth v York (50 Mass 93) (53 NY, at p 179). The law of Maine is still based on a York approach (see 421 US, at pp 695, 696), an approach rejected in Stokes as in contradiction to the New York statutes (53 NY, at p 179).
In 1961, a study commission was appointed to thoroughly review and update penal statutes that had not been subjected to a full-scale examination since the 1881 Penal Code. The Revised Penal Law of 1967, the end product of the commission’s work, contained new homicide provisions reflective of contemporary thought, to replace an anachronistic statute replete with concepts whose validity had been substantially eroded by time. Thus, the factors of premeditation and deliberation were discarded entirely. These two concepts, which alone distinguished first-degree murder from second-degree murder (and therefore death from life imprisonment), had become completely nebulous. (Third Interim Report of the Temporary *300 State Commission on Revision of the Penal Law and Criminal Code, NY Legis Doc, 1964, No. 14, p 22.) In the words of Mr. Justice Cardozo, "[i]f intent is deliberate and premeditated whenever there is choice, then in truth it is always deliberate and premeditated, since choice is involved in the hypothesis of the intent. What we have is merely a privilege offered to the jury to find the lesser degree when the suddenness of the intent, the vehemence of the passion, seems to call irresistably for the exercise of mercy. I have no objection to giving them this dispensing power, but it should be given to them directly and not in a mystifying cloud of words.” (Cardozo, Law and Literature, pp 100-101; see, also, Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Col L Rev 1425, 1445-1446.) The revised 1967 statute made murder a single, degreeless crime, requiring that the defendant, "[w]ith intent to cause the death of another person * * * causes the death of such person or of a third person”. (Penal Law, § 125.25.)[6]
The manslaughter provisions in the former Penal Law were also substantially revised. Under the old provisions, manslaughter was a fatal assault committed without homicidal intent, without a design to effect death. (Former Penal Law, §§ 1050, 1052.) "Heat of passion” had become, not a mitigating factor that would reduce a murder to manslaughter, but an affirmative element of a specified type of manslaughter. In its proposed statute, the commission suggested the elimination of the "hybrid offense” that had developed in New York, coupled with a return to the traditional principles of mitigation. (Notes of the Staff of the State Commission on Revision of the Penal Law and Criminal Code, 1967 Gilbert, Criminal Law and Practice of New York, pp 1C-1, 1C-61-1C-62.) The commission also replaced the traditional language of "heat of *301 passion”, with a new formulation, "extreme emotional disturbance”. In this respect, the commission adopted the manslaughter provisions in the Model Penal Code. (Model Penal Code, § 201.3, subd [1], par [b].) This change was designed to avoid limiting mitigation to the situation where a defendant, provoked, acts "under the influence of some sudden and uncontrollable emotion excited by the final culmination of * * * misfortunes”. (People v Caruso, 246 NY 437, 446.) The new formulation does not impose so arbitrary a limit on the nature of circumstances that might justify a mitigation. (Model Penal Code, § 201.3, Comment, pp 46-47 [Tent Draft No. 9].)
The original 1964 proposal of the commission did not, as the Model Penal Code does not, expressly state that the burden of establishing mitigating circumstance is upon the defendant. To clarify the situation, the 1965 proposal, ultimately enacted, made extreme emotional disturbance an affirmative defense to be proved by the defendant. The 1965 bill made no other substantive changes. (Fourth Interim Report of the State of New York Temporary Commission on Revision of the Penal Law and Criminal Code, NY Legis Doc, 1965, No. 25, pp 29-30.)
The present Penal Law thus provides that it is an affirmative defense to a murder prosecution that the "defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse” (Penal Law, § 125.25, subd 1, par [a]). The defense must be established by a preponderance of the evidence. (Penal Law, § 25.00, subd [2].) If the defense proves successful, the defendant may not be found guilty of the crime of murder, but only of the crime of manslaughter in the first degree. (Penal Law, § 125.20, subd 2.) The sentences that might be imposed for these crimes differ significantly. (See Penal Law, § 70.00.)
We conclude that the New York statutes do not infringe the due process interests which Mullaney v Wilbur (421 US 684, supra) sought to protect. The due process clause of the Federal Constitution requires that a conviction cannot be had unless the prosecution proves beyond a reasonable doubt "every fact necessary to constitute the crime” with which a defendant is charged. (In re Winship, 397 US 358, 364.) In New York, the prosecution, in order to obtain a conviction for murder, must prove beyond a reasonable doubt that the defendant, with intent to cause the death of another person, did cause the *302 death of such person or of a third person. (Penal Law, § 125.25, subd 1.) With respect to intent, the People must establish that the defendant’s conscious objective was to cause the death of the other person. (Penal Law, § 15.05, subd 1.) Intent may not be inferred from the simple fact of killing, but must be proved by other facts. That New York will permit the defendant to establish the existence of mitigating circumstances, collateral to the principal facts at issue, does not detract in the smallest degree from the rule, long established in this State, that the prosecution must prove intent beyond a reasonable doubt.
The law of Maine, under consideration in Mullaney, did not make the "facts of intent” general elements of the crime of felonious homicide. (421 US, at p 699.) Rather, the degree of intent was relevant only to punishment. (421 US, at p 699.) Even then, the prosecution was permitted to rely upon a presumption of malice, to be drawn from the fact of a killing. If the defendant acted under the heat of passion on sudden provocation, malice aforethought was negated since, under Maine law, as well as under the common law, malice and heat of passion are mutually inconsistent. (421 US, at pp 686-687.) That is to say, if the defendant’s mind was possessed by malice, his actions could not have resulted from an inflamed passion aroused by a sudden provocation. Under Maine law, malice and heat of passion are reflective of the defendant’s intent, and the State could not constitutionally provide the prosecution with a presumption of malice and then require the defendant to negate it with proof that he acted under the heat of passion. (421 US, at p 702.)
In New York, the prosecution is at all times required to prove, beyond a reasonable doubt, the facts bearing the defendant’s intent. That the defendant acted because of an extreme emotional disturbance does not negate intent. The influence of an extreme emotional disturbance explains the defendant’s intentional action, but does not make the action any less intentional. The purpose of the extreme emotional disturbance defense is to permit the defendant to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them. (See Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Col L Rev 1425, 1446.) The opportunity opened for mitigation differs significantly from the traditional heat of passion defense. *303 Traditionally, an action taken under the heat of passion meant that the defendant had been provoked to the point that his "hot blood” prevented him from reflecting upon his actions. (See, e.g., People v Ferraro, 161 NY 365, 375.) Furthermore, the action had to be immediate, for if there was time for "cooling off”, there could be no heat of passion. (See, e.g., People v Florentino, 197 NY 560, 563.) An action influenced by an extreme emotional disturbance is not one that is necessarily so spontaneously undertaken. Rather, it may be that a significant mental trauma has affected a defendant’s mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore. The differences between the present New York statute and its predecessor and its ancient Maine analogue can be explained by the tremendous advances made in psychology since 1881 and a willingness on the part of the courts, legislators, and the public to reduce the level of responsibility imposed on those whose capacity has been diminshed by mental trauma. It is consistent with modern criminological thought to reduce the defendant’s criminal liability upon proof of mitigating circumstances which render his conduct less blameworthy. So long as the prosecution must prove, beyond a reasonable doubt, that the defendant intended to kill his victim, it is not a violation of due process to permit the defendant to establish he formulated his intent while "under the influence of extreme emotional disturbance.”
Our dissenting brethren would draw a contrary conclusion based upon a broad reading of selected portions of the Mullaney opinion. We recognize that some of the language in Mullaney might, by a process of extrapolation, be applied to the provisions of the New York Penal Law. To be sure, the issue is not free from doubt. Yet it must also be recognized that judicial opinions are not written and rendered in the abstract. Language is given its meaning by the context which compels its writing. It is basic to our common-law system that a court decides only the case before it. While the Supreme Court in Mullaney struck down the Maine law of homicide, it did not reach out and pass on the constitutional validity of every State criminal statute that contains either an affirmative defense or a policy presumption. We believe, from our review of the history and development of the New York law of homicide, that New York homicide law differs significantly from the homicide law of Maine. In our view, this essential *304 difference makes this case materially distinct from that presented to the Supreme Court in Mullaney. For this reason, we do not believe that Mullaney mandates a holding that the affirmative defense of extreme emotional disturbance is unconstitutional (see Mitchell v Grant Co., 416 US 600, 615). Our law does not deprive the defendant in a murder prosecution of due process of law. We also believe, for the reasons stated by Chief Judge Breitel in his concurring opinion, that the concept of affirmative defenses is sound, valuable and is one that has a place in modern penal law. We hold, therefore, that the provisions of the New York Penal Law which set forth the affirmative defense of extreme emotional disturbance are not constitutionally infirm.
The issue of whether Gordon Patterson’s actions were committed under the influence of an extreme emotional disturbance was squarely presented to the jury. Although the People did not controvert the testimony of the defense psychiatrist, the jury was free to refuse to credit that testimony and to conclude, from the other evidence in the case, that the defendant had not established that his intent was formulated under the influence of an extreme mental trauma. The jury concluded that the defendant was not entitled to the mitigation permitted by statute and, on appeal to our court, from an affirmance by an intermediate appellate court, this finding is not reviewable by us. (See, e.g., People v Eisenberg, 22 NY2d 99, 101.)
We turn now to the issue of whether Roberta Patterson, the defendant’s wife, was properly permitted to testify as to the facts of the shooting and the conversation with the defendant during the ride from the scene of the crime. Although the Pattersons were, and are still, legally married to each other, the actions and words of the defendant were not protected by the marital privilege. (CPLR 4502.) Immediately after the shooting, the defendant attempted to strangle his wife. After releasing his grip on her, he ordered her about with a rifle still clutched in his hands. "This is strong evidence that defendant himself was not then relying upon any confidential relationship to preserve the secrecy of his acts and words”. (People v Dudley, 24 NY2d 410, 415.)
As to the other contentions advanced by the defendant, we find them to be without merit. Accordingly, the order of the Appellate Division should be affirmed.

. Penal Law (§ 125.25, subd 1, par [a]):
"§ 125.25 Murder in the second degree.
"A person is guilty of murder in the second degree when:
"1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative degense that:
"(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant’s situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime; or”.

. Penal Law (§ 125.20, subd 2):
"§ 125.20 Manslaughter in the first degree.
"A person is guilty of manslaughter in the first degree when:
* * *
"2. With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25. The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subdivision”.

. The only objection taken to the charge was that the jury could "infer” from the *294 court’s instructions that its only choice was between murder and manslaughter, whereas the jury could acquit the defendant. We note that the court’s instructions are not susceptible to any such "interference” and that this point is not advanced by the defendant on appeal.

. This statute, as well as the other statutes to be discussed infra, contained other provisions, including the forerunners of our present felony murder and "depraved indiiference” murder statutes. (See Penal Law, § 125.25, subds 2, 3.) However, for present purposes, it is sufficient to confine our discussion to the development of the crimes of intentional murder and voluntary manslaughter.

. This act inadvertently repealed, by the omission of a savings clause, the prior law defining crimes and authorizing the imposition of sentences. (L 1860, ch 410, § 7.) In Hartung v People (22 NY 95), the court held that the 1860 statute could not, by virtue of its ex post facto effect, be given retroactive application. Since it appeared that persons accused or convicted prior to the passage of the 1860 act might have to be released, the Legislature attempted to give the 1860 statute retroactive effect by granting defendants convicted prior to the passage of the 1860 act or convicted of crimes committed prior to passage, the option of selecting either life imprisonment or the death penalty. (L 1861, ch 303, § 3.) In 1862, the Legislature reverted back to the law as it stood prior to 1860. (L 1862, ch 197, §§ 4, 5.) However, a narrowed second-degree murder offense was retained. (L 1862, ch 197, § 5.)

. In 1974, the Legislature added a new crime, murder in the first degree. (Penal Law, § 125.27.) This statute comes into operation where the victim of the murder is a police officer, an officer in a correctional facility or where the defendant was incarcerated for a life sentence. A convicted defendant is tó be sentenced to death. (Penal Law, § 60.06.) As part of this enactment, section 125.25, which formerly defined the degreeless crime of murder, was retitled, without a change in substance, murder in the second degree. (L 1974, ch 367, § 4.)
It is noteworthy that the new first-degree murder offense also provides that the defendant may assert the affirmative defense of extreme emotional disturbance. (Penal Law, § 125.27, subd 2, par [a].) Successful interposition of the defense would reduce the crime to manslaughter in the first degree, not to murder in the second degree.