OPINION OF THE COURT
Leslie Crocker Snyder, J.
This court is presented with two issues of apparent first impression under New York law. The court must decide initially whether the People or the defense should bear the ultimate burden of persuasión at a bail surety hearing. Second, the court must decide if it is empowered under CPL 520.30 to prohibit the posting of a bond by a reputable bond company when the court finds, at a surety hearing, that the third parties who posted the collateral for the bond committed perjury in testifying about their relationship with the defendant.
 This court concludes that the defendant bears the ultimate burden of persuading the court that the collateral posted is not the fruit of criminal or unlawful conduct. In addition, the court finds that acceptance of a bail bond under the circumstances presented here would contravene public policy as it would not only foster and encourage third parties to commit perjury in surety hearings but it would also reward defendants who bribe and/or coerce the third parties to post the collateral.
POSTING OF THE BOND
The defendant, Leonardo Esquivel, a Colombian national also known as Carlos Suarez, was arrested and charged with possession of two kilograms of cocaine allegedly recovered from a storefront at 33-07 89th Street in Queens. The police also seized approximately $98,000 in cash, jewelry and various Colombian passports.
*722 Bail was set in the amount of $125,000 cash or bond. Two months after the defendant’s arrest, International Fidelity Insurance Company posted a $125,000 bond to secure the defendant’s release.
Under the terms of the bond, Mr. Domingo Rodriguez and his wife, Mrs. Guillermina Rodriguez, pledged their home located at 32-22 69th Street in Queens with the bond company as collateral for the defendant’s bail bond.
THE SURETY HEARING
A surety hearing was held pursuant to CPL 520.30. The defense called Mr. and Mrs. Rodriguez as witnesses at the hearing.
Mr. Rodriguez testified that he and his wife purchased their home approximately 17 years ago for $51,000 and that it is valued presently at $250,000. He stated that he met the defendant, known to him as Leonardo Esquivel, in April of 1990 when Mr. Rodriguez entered a real estate office in Queens County to seek assistance in purchasing a new home. Mr. Rodriguez stated that the defendant was a real estate broker and that he and the defendant met approximately 10 times over a two-year period to discuss his purchase.
On cross-examination, Mr. Rodriguez admitted that he did not know any personal information about the defendant. He saw the defendant accompanied by a female on one occasion, but he did not know the relationship between the woman and the defendant; nor did he know whether the defendant had any children. Mr. Rodriguez stated that he did not know the defendant’s home address, home phone number, or beeper number and that if the defendant were released, his only means of contacting the defendant would be through the real estate office.
According to Mr. Rodriguez, the defendant called him from jail after his arrest and asked him to post bail. After discussions with his wife, they elected to post their house as collateral for the bail bond. When questioned about his willingness to risk his family’s home for a man he allegedly barely knew, Mr. Rodriguez did not appear overly concerned and responded that all he expected from the defendant was "a thank you or something”.
Mr. Rodriguez concluded his testimony by stating that the family’s sole support is from disability benefits, Social Security, and food stamps.
*723 Mrs. Rodriguez testified that she first met the defendant at an office on 89th Street in Queens in August of 1991. She stated that she met the defendant approximately 10 times over the course of two years in his capacity as a real estate broker.
Initially, Mrs. Rodriguez testified that she did not know Mr. Esquivel’s home address. Subsequently, after returning to the witness stand on another day, she stated that the defendant lived on North Conduit Avenue in Queens County.
FINDINGS OF FACT
The court finds that the testimony given by Mr. and Mrs. Rodriguez cannot be credited. It included numerous contradictions and information inconsistent with statements made by the defendant to the Criminal Justice Agency. For example, Mrs. Rodriguez testified that the defendant gave her his home address as North Conduit Avenue in October 1990. According to the Criminal Justice Agency, the defendant did not reside at this address until July of 1991. In addition, the Rodriguezes testified that they visited the defendant in his office on 89th Street at least eight months before the defendant claims he was employed there.
Most important, the relationship between the Rodriguez family and the defendant is not based on friendship or trust and is not of any significant duration. Mr. Esquivel is merely a business acquaintance who has met the witnesses briefly on approximately 8 to 12 occasions over the past two years.
The court finds that the testimony of Mr. and Mrs. Rodriguez that they are posting their home simply to assist a business acquaintance to be unworthy of belief and refuses to credit it. The family’s sole support is from disability payments, Social Security and food stamps. The equity in their home represents the family’s major financial asset. It is inherently suspect that a family would be willing to risk its only significant asset for a defendant it hardly knows and has no reason to trust. Such a gesture is clearly contrary to experience and defies reason, logic, and common sense.
The court takes notice that the police recovered a large quantity of drugs and money from a location allegedly in the dominion and control of the defendant. The defendant stands charged with committing A-I narcotics violations with their potential lengthy prison sentences. The totality of the circumstances suggest that the defendant is eminently capable of *724 corrupting the indemnitors and has a compelling motive to do so. Therefore, this court must conclude that either some unknown arrangement exists between the Rodriguez family and the defendant or that the defendant induced the family to post their home as collateral through threats or bribes.
CONCLUSIONS OF LAW
CPL 520.30 sets forth the guidelines to be followed upon the posting of cash bail or a bail bond and justifying affidavits. This section allows the court to conduct an inquiry "for the purpose of determining the reliability of the obligors or person posting cash bail, the value and sufficiency of any security offered, and whether any feature of the undertaking contravenes public policy” (CPL 520.30 [1]).
The scope of the inquiry is defined in CPL 520.30 (l).[1] This
*725 statute specifically empowers the court to inquire into any matter "appropriate to the determination” and sets forth six general areas for the court’s inquiry, including but not limited to the "background, character and reputation of any person who has indemnified or agreed to indemnify an obligor upon a bond.” (CPL 520.30 [1] [d].) The First Department has held that this section "grants the Hearing Justice substantial discretion” in an inquiry into the source of collateral for a bail bond. (Matter of Johnson v Crane, 171 AD2d 537, 538 [1st Dept 1991].)
In 1984, the Legislature amended the bail statutes to revise the statutory inequities between the rights of depositors of cash bail and sureties of bail bonds.* [2] In conjunction with the amendment to CPL 520.15[3] permitting the posting of cash bail, the Legislature also amended CPL 520.30 to permit the court for the first time to scrutinize the source of cash bail to determine if the money posted constitutes the fruits of criminal or unlawful conduct. To initiate this inquiry, CPL 520.30 *726 requires that the District Attorney present the court with "reasonable cause” to believe that such money constitutes the fruit of criminal or unlawful conduct.
The 1984 amendments created an apparent inconsistency between surety examinations for bail bonds and for cash bail. Where a bail bond is posted as opposed to cash bail, the statute seems to authorize a surety examination whenever the court or the People are concerned about the reliability of the obligors. The rationale for this distinction may be that the primary concern of the Legislature is to make certain that if the defendant fails to appear, the collateral posted can be forfeited. Where a bail bond is posted, the defendant is released on the obligor’s promise to pay if the defendant fails to appear. Therefore, the reputation and character of the obligor and sufficiency of the collateral is relevant. Where cash bail is posted, the State is already in possession of the collateral prior to the defendant’s release.
This distinction, based upon the type of security posted, may serve to ensure that the State is able to forfeit all of the bail posted if a defendant flees. However, it makes no logical sense for a court to distinguish between cash bail and bail bonds in deciding whether to order an examination of surety where it appears that the collateral may be the fruit of unlawful conduct.

I. Burden Of Proof

The first issue presented to this court, as noted, is to decide which party bears the ultimate burden of persuasion at a surety hearing.
When a bail bond is presented as security, defense counsel generally provides the People with the deed to the property, a recent title search, an appraisal, a statement setting forth any mortgages or liens on the property and any other relevant records. If the court or the People have a rational basis for inquiring into the reliability of the obligors or the source of the collateral posted after analyzing the documents presented by the defense, a surety hearing should be ordered by the court.
Where cash bail is posted, the statute requires the People to support their request for the inquiry with a showing of reasonable cause to believe that the money posted was not obtained legally. In practice, the surety not only supplies the court with the information required by CPL 520.15 (2), but also supplies the Assistant District Attorney with the financial records of *727 the account from which the funds were withdrawn. If the defense were not required to supply this information by a court, it would be impossible for the People to make any determination about the source of the funds whatsoever. Because the People must rely upon the records submitted by the defense without having a full opportunity to investigate independently the source of the funds, an offer of proof by the People, setting forth their grounds for suspecting the legitimacy of the money posted, should suffice to meet their burden.
However, once this minimal standard is met, under New York law it is unclear which party bears the ultimate burden of persuasion at the surety examination. This court holds that the defendant bears the ultimate burden of persuading the court by a preponderance of the evidence that the money or property posted as collateral is not the fruit of unlawful or criminal conduct.
The bail set by a court is not a ransom which will allow a defendant to flee if he or she is able to afford it. In determining the amount which a court will require for bail, the court must consider, among other factors, the defendant’s criminal record, community ties, the nature of the charges and potential sentence, the defendant’s employment history and financial resources. (CPL 510.30.) If a defendant who has not obtained the collateral illegally is able to raise the funds to secure his or her release, then the potential of forfeiture of these funds will serve to prevent the defendant’s flight.
However, it is clear to any court with experience in organized crime/narcotics cases that many defendants have obtained vast amounts of money and property through the illegal trafficking of drugs. If the funds posted are the fruits of criminal or unlawful conduct, then a defendant may choose simply to forfeit the collateral and flee. This is a small price to pay for the "privilege” of reaping hundreds of thousands of dollars in illegal profits prior to apprehension.[4]
Moreover, the bail amount set by the court may not have taken into account a defendant’s hidden financial resources. To evade forfeiture statutes, many defendants attempt to hide their assets from law enforcement authorities. Remission of the bail set by the court may not serve to inhibit the defendant’s flight. Therefore, the ultimate burden of proof is appropriately placed on the defense to persuade the court that the *728 funds were legally obtained, thereby insuring that the bail amount held by the court will provide an incentive to the defendant to return to court.
Finally, the defendant is uniquely suited to know the source of the bail funds. If the prosecution were required to investigate the source of any and all funds and/or property posted, the court would be required to grant the People an adjournment to conduct the investigation, thereby delaying the defendant’s release and frustrating the purpose of bail. Such investigation could include the obtaining of foreign and domestic records such as deeds, title searches, appraisals, tax returns and bank records — all time consuming but necessary investigative procedures — if the People were to bear the burden of persuasion. Indeed, many of the records in the narcotics area are from foreign countries and would be unavailable to the People as a practical matter.
To place such a burden on the People without giving them an opportunity to prepare adequately would be unjust. To require a defendant who has a legitimate source for his or her bail funds to remain incarcerated while the People conduct a lengthy investigation would be equally unfair. Therefore, in the interests of obtaining an expeditious and yet informed determination by the court, the ultimate burden of persuasion must be borne by the defense.
Placing the burden of proof on the defense in contexts collateral to the question of guilt is well established under New York law.[5] The rationale for placing the burden on the defendant was set forth by the Court of Appeals in People v Patterson (39 NY2d 288 [1976], affd, sub nom. Patterson v New York, 432 US 197, 211-212, n 13 [1977]). In Patterson (at 305), in his concurring opinion cited with approval by the majority, then Chief Judge Breitel stated that the "placing of the burden of proof on the defense * * * is fair because of the defendant’s knowledge or access to the evidence other than his own on the issue”.[6]
*729 This same rationale applies to surety hearings. While a prosecutor can only surmise the source of the bail funds after an exhaustive accounting of an indemnitor’s assets, this information is readily available to the defendant. Clearly a defendant is in a better position than a prosecutor to provide the court with the necessary financial records and releases to enable the court to decide the legitimacy of the funds. Therefore, the defendant must bear the ultimate burden of persuasion at a surety examination.

II. Public Policy Considerations

The next issue presented to this court is whether a court is empowered under CPL 520.30 to prohibit the posting of a bail bond on the public policy grounds that the third-party indemnitor was either bribed or coerced into posting the collateral with the bond company. It is the defense’s position that once the court finds that the bond company is trustworthy and that the State will be fully compensated should the defendant flee, the court’s inquiry must end. The defendant alleges that sufficiency hearings are intended solely to protect the State from undesirable properties or the use of criminal proceeds as bail collateral. The defense maintains that compensation to the State should be the court’s only concern, and that once the surety is shown to be reliable, the court has no power to inquire further.
However, this court finds that the intended purpose of CPL 520.30 has not been so narrowly interpreted as the defendant contends. Nor should it be. The Practice Commentary to CPL 520.30 suggests that when an issue of public policy is involved, a bail bond inquiry may extend beyond the financial soundness of the obligor and empower the court to examine the background and purpose of any indemnitor. (Bellacosa, Prac *730 tice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 520.30, at 57.)[7]
The rationale behind this statutory interpretation is that if the surety-obligor is fully indemnified under the terms of the bond, then the surety-obligor risks nothing and the risk of penalty is borne by the indemnitor. Consequently, a court must be permitted to consider the indemnitor’s motive in posting the bond in determining whether a bail bond should be accepted or refused. For example, the indemnitor may be posting the collateral solely to enable the defendant to flee. (See, United States v Dussuyer, 526 F Supp 883 [SD Fla 1981].) Since the indemnitor is assuming the risk of the defendant’s flight, public policy requires that a court be able to examine the nature of the relationship between the indemnitor and the defendant and the extent to which forfeiture of the collateral posted will deter a defendant from fleeing the jurisdiction.
If the court’s inquiry is limited to the surety-obligor as the defense contends, then any defendant, by using a bond company, could shield himself or herself from a bail source inquiry. This court refuses to allow the intent of the Legislature in establishing surety hearings to ensure the legitimacy of funds posted for bail to be undermined by such a narrow interpretation of the bail statutes as the defense proposes.
The Federal courts recognize a court’s obligation to ensure that the bail arrangement will serve to prevent a defendant’s flight. In United States v Melville, the court stated that "[t]here is no way in which the Court can assess the impact and influence of a bail bond on the defendant’s proclivity to flee without some detailed knowledge of those posting the collateral.” (309 F Supp 824, 828 [SD NY 1970].) To fulfill this obligation, Federal courts inquire into those posting the collateral in order to determine the likelihood of a defendant’s *731 return to court in the future. (See, United States v Fedullo, 525 F Supp 1210, 1214 [D NJ 1981]; American Druggists Ins. Co. v Bogart, 707 F2d 1229,1233 [11th Cir 1983]; United States v Nebbia, 357 F2d 303 [2d Cir 1966].)
It is readily apparent to this court that justice is hindered by approval of a bail arrangement that fails to assure the court of a defendant’s return. The public’s confidence in the criminal justice system would unquestionably suffer if Judges were prohibited from disallowing bail bonds which do not ensure a defendant’s return, but instead, invite flight. (See, People v Public Serv. Mut. Ins. Co., 37 NY2d 606 [1975].) Where a court believes that an indemnitor has been bribed or coerced to put up collateral, there is no assurance that the threat of forfeiture of that collateral will inhibit a defendant’s flight.
CONCLUSION
This court concludes that to accept the bail package offered by the defendant would be to ignore clear indicia of coercion or conspiracy to evade bail bond statutes. The substance of the witnesses’ testimony indicates that no credible basis exists for the Rodriguez family to post as collateral their sole asset for a defendant with whom they have a minimal relationship. In addition, the relationship between the Rodriguez family and the defendant does not assure this court that the defendant would return if he were released on a bail bond indemnified by individuals who perjured themselves before the court.
Logically, there are only two possible reasons for the Rodriguez family to offer to post their home: either the defendant or an associate has bribed the Rodriguez family to post their house as collateral or the family has been threatened. In either case, the court finds that acceptance of this bail bond would contravene public policy as it would reward criminal behavior and encourage other defendants to bribe or coerce third parties into posting collateral. Manipulation of the bail bond process to limit the court’s substantial discretion to inquire into the source of collateral used to secure a bail bond must not be allowed. (See also, Matter of Johnson v Crane, 171 AD2d 537, supra.)
For the reasons set forth above, the court refuses to accept the bail bond posted by the defendant.

. CPL 520.30 (1) provides that:
"Following the posting of a bail bond and the justifying affidavit or affidavits or the posting of cash bail, the court may conduct an inquiry for the purpose of determining the reliability of the obligors or person posting cash bail, the value and sufficiency of any security offered, and whether any feature of the undertaking contravenes public policy; provided that before undertaking an inquiry, of a person posting cash bail the court, after application of the district attorney, must have had reasonable cause to believe that the person posting cash bail is not in rightful possession of money posted as cash bail or that such money constitutes the fruits of criminal or unlawful conduct. The court may inquire into any matter stated or required to be stated in the justifying affidavits, and may also inquire into other matters appropriate to the determination, which include but are not limited to the following:
"(a) The background, character and reputation of any obligor, and, in the case of an insurance company bail bond, the qualifications of the suretyobligor and its executing agent; and
"(b) The source of any money or property deposited by any obligor as security, and whether any such money or property constitutes the fruits of criminal or unlawful conduct; and
"(c) The source of any money or property delivered or agreed to be delivered to any obligor as indemnification on the bond, and whether any such money or property constitutes the fruits of criminal or unlawful conduct; and
"(d) The background, character and reputation of any person who has indemnified or agreed to indemnify an obligor upon the bond; and whether any such indemnitor, not being licensed by the superintendent of insurance in accordance with the insurance law, has within a period of one month prior to such indemnity transaction given indemnification or security for like purpose in more than two cases not arising out of the same transaction; and
"(e) The source of any money posted as cash bail, and whether any such money constitutes the fruits of criminal or unlawful conduct; and
*725 "(f) The background, character and reputation of the person posting cash bail.” (Emphasis added.)

. Cash bail did not exist in common law and is a statutory creation. (Badolato v Molinari, 106 Misc 342, 345 [1919].) Where a bail bond was posted to secure a defendant’s freedom, the court looked to the bondsperson to ensure the return of the defendant. However, where cash bail was posted, the court relied upon the potential forfeiture of the money to preclude a defendant from fleeing. (See, Moloney v Nelson, 158 NY 351, 355 [1899]; People v Castro, 119 Misc 2d 787 [1983].) Prior to these amendments, while CPL 530.80 (2) permitted a surety to surrender the defendant, a depositor of cash bail did not have that right. In addition, while CPL 210.10 (2) provided for notice to the surety if the defendant was indicted during the pendency of a felony complaint, no such notice provision applied to depositors of cash bail. Finally, based upon common-law tradition, CPL 520.15 (2) (e) required "posters” of bail bonds to insure the defendant’s appearance in court. (See, Mem of Senator Gold, Bill Jacket, L 1984, ch 384.)

. CPL 520.15 (2) provides: "The person posting cash bail must complete and sign a form which states (a) the name, residential address and occupation of each person posting cash bail; and (b) the title of the criminal action or proceeding involved; and (c) the offense or offenses which are the subjects of the action or proceeding involved, and the status of such action or proceeding; and (d) the name of the principal and the nature of his involvement in or connection with such action or proceeding; and (e) that the person or persons posting cash bail undertake that the principal will appear in such action or proceeding whenever required and will at all times render himself amenable to the orders and processes of the court; and (f) the date of the principal’s next appearance in court; and (g) an acknowledgement that the cash bail will be forfeited if the principal does not comply with any requirement or order of process to appear in court; and (h) the money posted as cash bail.”

. Letter of Caruso, Patrolmen’s Benevolent Assn, Bill Jacket, L 1984, ch 384.

. (People v Rosa, 65 NY2d 380, 387 [1985], citing People v Berrios, 28 NY2d 361 [1971].) In Rosa, following the Rogers/Bartolomeo rule, the Court of Appeals held that when a defendant moved to suppress a statement on the grounds that he was represented by counsel on a pending charge of which the police had knowledge, it is the defendant’s burden to prove police knowledge of the prior representation. (People v Rogers, 48 NY2d 167 [1979]; People v Bartolomeo, 53 NY2d 225 [1981], overruled People v Bing, 76 NY2d 331 [1990].)

. The New York Legislature has required a defendant who asserts an *729 affirmative defense to bear the burden of proving his or her defense by a preponderance of the evidence. These affirmative defenses include a defendant’s claim of lack of criminal responsibility by reason of mental disease or defect (People v Kohl, 72 NY2d 191 [1988]); the claim that the defendant acted under extreme emotional disturbance (People v Patterson, 39 NY2d 288, supra); and the affirmative defense provisions of the felony murder statute. (People v Donovan, 53 AD2d 27 [3d Dept 1976].) These provisions have been held to be constitutional because placing the burden of proof on the defense does not relieve the People of the ultimate burden of proving all of the elements of the offense charged beyond a reasonable doubt, including all components of the applicable mental state element. (People v Kohl, 72 NY2d 191, 193-194 [1988].)

. The Practice Commentary to CPL 520.30 (Bellacosa, McKinney’s Cons Laws of NY, Book 11 A, at 57) states: "This section permits a court, after a bail bond and justifying affidavits have been posted, to conduct an inquiry to determine the reliability of the obligor, the value of the security, and whether any part of the undertaking violates public policy. The inquiry, conducted generally upon application of the prosecutor, is directed primarily toward the obligor rather than the underlying indemnification, except when a public policy question may be implicated, as for example the money or property used as a security comes from an illegal source.” (Emphasis added.) (See, also, Abramovsky, Bail-Source Hearings, NYLJ, July 29, 1992, at 3, col 1; Matter of Inquiry [CPL 520.30], 78 Misc 2d 244, 248 [1974] [where the court disapproved a bail bond indemnified by church funds finding that the posting of the bond was outside the scope of the church’s bylaws and therefore against public policy].)