OPINION OF THE COURT
Seymour Rotker, J.
An indictment was filed against the defendants on January 20, 2000 charging them with, inter alia, the crime of enterprise corruption (Penal Law § 460.20). The defendants were ar *695 raigned on the indictment and bail for the defendant Agnello was fixed in the amount of $10 million, and bail for the defendant Scala was set in the amount of $100,000.
Thereafter an application was made by Agnello to have his bail reduced and that application was granted. The defendant’s bail was reduced to $2 million cash or bond and the District Attorney, pursuant to CPL 520.30, thereafter requested a bail sufficiency hearing.
FACTS
At the bail sufficiency hearing, the defendant Agnello proceeded to call a number of witnesses who testified that they were either friends or relatives of Mr. Agnello. Their testimony was offered to demonstrate that they collectively owned property in excess of $2.2 million. They further testified that they were freely and voluntarily pledging their property as indemnitors on the bond and also that they were aware that they were each jointly and severally liable for the face value of the bond in the event that the defendant absconded.
Mr. and Mrs. D’Alia, as indemnitors, offered their home, valued at $400,000, as security on the bond. They further testified that they were also willing to pay the premium and associated costs for the bond which totaled approximately $126,000. They testified that they were willing to assume this expense without hope of recompense from the defendant either directly or indirectly, but rather were doing so out of “friendship” for the defendant Agnello. Mr. D’Alia testified that he had met the defendant Agnello approximately 16 years ago at a racetrack where Mr. D’Alia worked as a security guard. He also testified that over the years, on approximately two separate occasions, he had borrowed a total of about $6,100 to cover the costs of a gambling debt and his medical bills, and that he promptly repaid these loans. Mr. D’Alia also stated that on occasion he had visited Mr. Agnello at his home and saw him at other social events. Mrs. D’Alia testified that she first met the defendant for the first time approximately two years ago, and had only seen him one other time thereafter. She also testified that she had “no problem” in paying the $126,000 premium.
Mr. D’Alia testified that he was employed by a private firm as a security guard for the Aqueduct, Belmont and Saratoga racetracks and earned approximately $800 weekly. He exhibited his bankbooks and statements which indicated that he had immediate access to approximately $300,000 in cash and that his wife was collecting approximately $20,000 a year from *696 her 1992 winnings of $400,000 from Harr ah’s gambling casino in Atlantic City.
At the conclusion of the testimony of all the witnesses, the court reserved decision until the following court date. On the next court date and prior to the court’s ruling, the defendant Agnello made an application to the court to withdraw the D’Alias as the payers of the bond premium and to substitute them with Victoria Gotti Agnello, Mr. Agnello’s wife. Ms. Gotti testified that she was an author and currently had a contract with Crown Publishing Company, a subsidiary of Random House Publishing. According to the terms of her contract, which were exhibited to the court, she was entitled to receive a sum of money, in excess of $125,000, payable in increments over the next several months. She testified that her fee would be used to pay the premium.
The agent for the bonding company, International Fidelity Insurance Company, was recalled to the stand and testified that his company would have no problem in issuing the bond for $2 million and trusting that the premium would be paid by Ms. Gotti. At the conclusion of the hearing, the District Attorney withdrew his objection to the issuance of a bond for Mr. Scala.
LEGAL ARGUMENT
The District Attorney, among other things, argued that the public policy provisions of CPL 520.30 allowed inquiry by the court not only into the source of the property used to indemnify the bonding company, but also as to the source of the money that was used to pay for the bond premium and costs.
The defendant argued that the indemnitors were bona fide and that no legal basis existed for the court to inquire into the source of the funds used to pay for the premium. Even assuming that the court could examine the source of the funds used to pay for the premium,, the defendant maintained that no issue existed since the testimony of Ms. Gotti clearly demonstrated that the funds to be used to pay the premium were not tainted since her testimony revealed that those funds were derived from money owed to her by a reputable publishing company pursuant- to a preexisting work contract.
DECISION
CPL 520.30 sets forth the criteria for an examination by the court to justify the issuance of a bail bond. The statute permits the court to make an inquiry into the financial viability of the *697 obligors and whether any feature of the undertaking contravenes public policy. GPL 520.30 (1) specifically states that:
“The court may inquire into any matter stated or required to be stated in the justifying affidavits, and may also inquire into other matters appropriate to the determination, which include but are not limited to the following:
“(a) The background, character and reputation of any obligor * * *
“(b) The source of any * * * property deposited by any obligor as security * * *
“(c) The source of any * * * property delivered or agreed to be delivered to any obligor as indemnification on the bond * * *
“(d) The background, character and reputation of any person who has indemnified or agreed to indemnify an obligor upon the bond.” (Emphasis added.)
This statute, as interpreted by People v Esquivel (158 Misc 2d 720 [Sup Ct, NY County 1993]), places the burden of proof on the defendant to show by a preponderance of the evidence that the money or property posted as collateral is not the fruit of unlawful or criminal conduct. Esquivel (supra) further held that when an issue of public policy is involved, the inquiry by the court may extend beyond the financial soundness of the obligor, such as the bonding company, and that the court is empowered to examine the purpose of any indemnification.
The rationale behind this interpretation is that if the surety obligor is fully indemnified then the risk on a defendant’s default is borne by the indemnitor. Accordingly, logic would dictate that the court be allowed to consider the indemnitor’s motive in posting the bond. Since the indemnitor is assuming the risk of the defendant’s flight, public policy requires that the court be able to examine the nature of the relationship between the indemnitor and the defendant, and the extent to which the collateral posted would deter the defendant from fleeing the jurisdiction.
The statute (CPL 520.30) permits an inquiry by the court into any matter stated or required to be stated in the justifying affidavit. CPL 520.20 (4) identifies what constitutes a “justifying affidavit.” The affidavit “must be subscribed and sworn to by the obligor-affiant” — and such affidavit must contain further statements as follows: “[t]he amount of the premium paid to the obligor.” (CPL 520.20 [4] [a] [i].) Following the reasoning of the court in Esquivel (supra), and in the opinion of this court under the above subdivision, in addition to reviewing the in *698 demnitors, the court may also review the source of the money used to pay the premium for the bond.
Accordingly, the court finds that under the facts and circumstances as testified to at the bail sufficiency hearing, the court is satisfied that the indemnitors in this case possess a financially secure background, that the source of the funds used to indemnify the bonding company is not in violation of public policy, and that none of the property proffered as indemnification on the bond stems from any illegal or criminal activity.
This court also finds that the source of the payment of the fee for the premium does not come from illegal or contraband sources.