THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MIKAIL A. ABDUL-MALIK, Appellant.

First Department, March 30, 1978

---

## APPEARANCES OF COUNSEL

*Howard N. Spiegler* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Benjamin H. Green* of counsel *(Robert M. Pitler* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

On appeal defendant, convicted of the crime of rape in the first degree (Penal Law, § 130.35), raises several issues, only two of which cause us any concern. Defendant cites as error the trial court's charge on "consciousness of guilt" and, as further ground for reversal, certain prejudicial remarks by the prosecutor in his summation.

On the People's case a signed statement by defendant, given to a New York City Police Department detective on the day of his arrest, which was clearly exculpatory in nature, was received in evidence. Its only relevance was to show a consciousness of guilt on defendant's part. Although defendant had challenged the admissibility of the statement at a *Huntley* hearing, he raised no objection to its admission at trial, quite obviously for the reason that he was getting his version of the incident before the jury without having to take the stand. That version was not entirely implausible.

The incident is alleged to have taken place on June 22, 1974. The complainant testified as follows: she first met defendant in the spring of 1974 at Brooklyn College where both were students. On one occasion, he accompanied her home after class and was invited in for sandwiches. In time and at his request, she gave him her telephone number. On the evening in question, a Saturday, at about 8 P.M., defendant called and asked if the complainant would like to go out to dinner and a movie that night. The complainant accepted and agreed, at defendant's suggestion, that they meet for convenience sake at his apartment in Manhattan, inasmuch as she lived out near Kennedy Airport and they planned to go to dinner and a movie in Manhattan. The complainant arrived at defendant's apartment at about 10 P.M. Some time was spent talking and listening to the radio. The hour soon became late and the complainant began to express concern that they had better get started on their evening out. Defendant's response was to tell the complainant to relax, that she was "uptight". When she then attempted to leave, defendant began to strike her. Her efforts to fight back were to no avail. Finally, too weak to resist, the complainant was thrown on the couch. The rape followed.

After attending to herself in the bathroom, the complainant again attempted to leave. She got as far as the front of the building when defendant caught up with her. At the same

time a "rookie" patrolman happened to pass by. After convincing the patrolman that only a domestic squabble was involved, defendant dragged the complainant back to the apartment, where, according to the complainant, he again beat her. She attempted to leave once more, without success. At this point, the complainant resigned herself to her plight and spent the next few hours sitting near a window. From the time the complainant was forced back to the apartment from downstairs, there was no further sexual contact between the parties. In the early hours of June 23, 1974 the complainant was released, with a warning that if she went to the police, defendant would kill her. Once in the street, the complainant asked for directions to the nearest police station. She then walked to the 9th Precinct but, exhausted from her ordeal and unable to think clearly, she said nothing about the rape, assuming, apparently, that the officers at the precinct would see her condition and come to her aid. She did attempt, by telephone, to reach her brother, a police officer assigned to the 13th Precinct. However, he was off duty. Convinced that she was receiving no satisfaction, the complainant decided to walk to the 13th Precinct where she also knew a female police officer.

At the 13th Precinct, the complainant explained what had happened to her. She was brought back to the 9th Precinct where she filed a complaint charging rape. Later that day, at Bellevue Hospital, a gynecologist found abnormal tenderness in her vagina and pelvic region. The pain which the complainant experienced on examination was, according to the doctor, consistent with recent sexual relations. The doctor also found bruises of recent origin over her left eye and on her back, as well as some scratches on her right arm.

According to defendant's statement, which was taken from him the afternoon on June 23, 1974, he had been "going with" the complainant since June 13, 1974. He had escorted her home from school almost every evening since they met and she had been given a key to his apartment. She had stayed with him at his apartment the weekend previous to June 22, during which on several occasions they had had sexual relations.

Defendant stated that on the Thursday preceding the incident, he had accompanied the complainant to her home to pick up clothes for the coming weekend, which she was to spend at his apartment. While there he had dinner. They had

spent Friday and Saturday, June 21 and 22, at his apartment where they had sexual intercourse again on several occasions.

On the night in question, while the couple was out walking, the complainant precipitated a quarrel. The argument continued after their return to the apartment and there was assaultive conduct by both sides. The complainant had sustained her injuries as a result of her own violent behavior. His explanation, which will not be repeated here, was lengthy and replete with detail. In typewritten form it ran to three pages, and included the incident where the parties met the rookie patrolman in front of the building.

It is well established that before a jury may be charged that a defendant's assertion of a false explanation may imply a "consciousness of guilt", the People must seek to prove the falsity of the statement by evidence independent of that offered directly to prove the defendant's guilt. *(People v Russell,* 266 NY 147.) At trial, the only independent evidence other than that directly offered to prove defendant's guilt was the testimony of the complainant's mother to the effect that the complainant had never spent any nights away from home, as contended by defendant in his statement. This was crucial on the issue of whether there was a pre-existing sexual relationship between the parties. The complainant's testimony on this point would not be independent evidence because her testimony was essential to prove that the sexual intercourse on the night in question was nonconsensual, especially in view of the fact that the parties had known each other. The mother's testimony was of the weakest sort. Although she testified that her daughter was home every night for the two-week period prior to June 22, she had no specific recollection of any of the nights involved. She testified instead only as to her daughter's habits from household routine.

On the subject of consciousness of guilt, the court charged as follows:

"A statement of the defendant really presents a kind of a tricky legal problem for *[sic]* my point of view which perhaps I will comment on briefly.

"It was introduced by the District Attorney on his view that he has urged you to accept that it is at least in part untrue. And his view has *[sic]* demonstrated to be untrue by the testimony primarily the testimony of the complaining witness' mother.

"And if you agree that it was untrue that you might

possibly infer from the fact that the defendant had told the police officer something. So a consciousness of guilt on his part. That is the law. If, in fact, you conclude that it was in part untrue, you have a right to consider that together with all the evidence in the case.

"In regard to your judgment about the defendant's guilt. Having been introduced by the District Attorney you may obviously consider it as a whole with whatever reasonable inferences you want to draw from it either way in this case."

The difficulty with this instruction, as it stands recorded, is that it failed to delineate for the jury the precise portion of the statement which they could consider on consciousness of guilt and to identify that which it was to be balanced against. This is significant because the only part of defendant's account which the People attempted to disprove by independent evidence was the statement that the complainant had spent the previous weekend with him at his apartment.

■ There is no doubt that the court was attempting to give defendant the exculpatory benefit of the entire statement as the defense version of the incident. However, when taken together with a comment by the prosecutor during summation and a curative instruction, the charge may well have left the jury with the impression that the whole of the statement might be considered on consciousness of guilt.* That was grossly unfair to the defense. It is one thing to disbelieve a defendant. That is a jury's right. It is quite another, though, to suggest to a jury that they could, at the same time, transpose such disbelief into corroboration of the People's case. This tends impermissibly to shift the burden of proof. Hence, the rule permits only that part of a defense which by independent proof is shown to be a fabrication to be considered, for the inference of consciousness of guilt. *(People v*

---

\* "Assistant District Attorney: \* \* \* I suggest to you that the evidence in this case shows that he is the liar. There is a theory in law that a man who gives a false exculpatory statement is conscious of his own guilt and that is why he gives the false exculpatory statement.

"Defense Counsel: Objection, Judge.

"The Court: It's a matter of law, but I think that this is also a matter of argument. That he may make it. Don't worry about the legal aspects if it is a reasonable inference for you, that's your function.

"Assistant District Attorney: If you find that the reason he lied was to get off, then you have to decide what the thing he was getting of from was the rape he had committed."

*Russell,* 266 NY 147, *supra; People v Deitsch,* 237 NY 300, 303.)

Concededly, defense counsel failed to except to the "consciousness of guilt" portion of the charge. Hence, any error with respect thereto is not preserved for appellate review. (CPL 470.05.) However, defendant argues that no exception is necessary to preserve for review a fundamental constitutional right, such as comment on a defendant's failure to take the stand *(People v McLucas,* 15 NY2d 167, 172) or the shifting of the burden of proof in a trial *(People v Patterson,* 39 NY2d 288, 296, affd 432 US 197). Moreover, in an appropriate case, we may reverse as a matter of discretion in the interest of justice. (CPL 470.15.)

■ But we need not reach the issue whether any deficiency in the charge on consciousness of guilt in the circumstances presented herein, standing alone, is of such dimension as to warrant reversal. A new trial is mandated, in any event, by virtue of the prejudicial effect of certain remarks by the prosecutor on summation by which he compared defendant's unsworn statement with the complainant's sworn testimony, both at trial and in other judicial proceedings, in a manner that served to highlight and draw the jury's attention to the fact that defendant had not taken the stand.

The prejudicial remarks are as follows: "Who is telling the truth. I suggest to you before that, in this case, there would not be a possibility of mistake. I suggest it is still true. Either the sworn statements at the preliminary hearing, the Grand Jury hearing in front of another judge and at trial of [the complainant] the *[sic]* lies or the unsworn, uncrossed *[sic]* examined sole *[sic]* searching statement of Mr. Malik to the detectives at the time of his arrest is a lie." A timely objection to this comment was taken by defense counsel and overruled.

The obvious mischief inherent in the prosecutor's comment is the improper reference to defendant's failure to take the stand. Such comments have long been proscribed by decisional law in this State *(People v McLucas, supra; People v Hetenyi,* 304 NY 80) and if they survive appellate scrutiny at all, it is only in those instances where there is "no reasonable possibility that the error might have contributed to defendant's conviction". *(People v Crimmins,* 36 NY2d 230, 237.) In a close case such as this, turning as it did solely on the testimony of the complainant, we cannot conclude that the prosecutor's comments were harmless.

■ There is also an additional element of the prosecutor's remarks which we believe to be so prejudicial as to command reversal. The prosecutor buttressed the testimony of the complainant when he commented on her sworn testimony at the preliminary hearing and the Grand Jury proceeding. This was highly improper. Moreover, the reference to the complainant's testimony before the Grand Jury was a matter dehors the record. The Grand Jury minutes were never used at trial. While a transcript of the preliminary hearing held in the Criminal Court was used by defense counsel, it was only for the limited purpose of attempting to impeach the complainant's testimony by showing a prior inconsistency. In all, six questions and answers from the transcript of the preliminary hearing were used as the basis of questions put to the complainant to show an inconsistency with her in-court testimony. Such use of the transcript was no justification for the prosecutor's remarks, the effect of which was to convey to the jury the unavoidable conclusion that since the complainant had testified under oath previously at both a preliminary hearing and before a Grand Jury, her version had already been found credible in two forums. Her testimony was then contrasted with defendant's statement, unsworn and untested by the rigors of cross-examination. This constituted impermissible buttressing. (Cf. *People v Katz*, 209 NY 311, 342.)

The People attempt to justify the prosecutor's remarks by arguing that it was defense counsel who sought to exploit the statement by placing before the jury defendant's version of the events on the night in question. The People contend that this was done both in summation and through the testimony of a defense witness, Oswaldo Claudio. This argument ignores the fact that it was the People who placed defendant's statement before the jury. Except for its tenuous admissibility under the consciousness of guilt theory, it was otherwise inadmissible, being hearsay. Furthermore, with or without defendant's statement, the witness Claudio could have testified, as he did, to having seen the complainant at defendant's apartment one evening in the summer of 1974 in a blue oriental nightgown, and the suggestion of a pre-existing consensual relationship would have been conveyed to the jury. As for defendant's summation, counsel gave a brief synopsis of defendant's contentions as reflected in his statement, and posed to the jury the question "[n]ow, the issue is * * * [n]ot who do you believe more, but do you believe [the victim]

beyond a reasonable doubt and consequently disbelieve [the defendant] beyond a reasonable doubt." There were several other brief references to defendant's statement. Finally, defendant's attorney placed before the jury the rhetorical question whether defendant, if he were actually guilty, would have made such a statement of his own free will, without the benefit of a lawyer, when he was well aware of his rights.

This limited use of defendant's statement on summation by defense counsel did not justify the prosecutor's comment, the effect of which was to place in direct conflict the victim's version against defendant's in a manner designed to highlight the fact that defendant did not testify. Additionally, the prosecutor's remarks improperly buttressed the People's version by the references to other proceedings where that same sworn testimony had been offered and, by implication, accepted.

Accordingly, the judgment of the Supreme Court, New York County (SANDLER, J. at trial and sentence, POLSKY, J. at suppression hearing), rendered July 7, 1975, convicting defendant, after jury trial, of the crime of rape in the first degree and sentencing him to an indeterminate term of from four and one-half years' to nine years' imprisonment should be reversed, on the law and as a matter of discretion in the interest of justice, and a new trial directed.

LUPIANO, J. P., BIRNS, EVANS and LANE, JJ., concur.

Judgment, Supreme Court, New York County, rendered on July 7, 1975, unanimously reversed, on the law and as a matter of discretion in the interest of justice, and a new trial directed.