■ The People of the State of New York, Respondent, v Ramon Roche, Appellant. [729 NYS2d 722] —Judgment, Supreme Court, New York County (Renee White, J.), rendered October 19, 1998, convicting defendant, after a jury trial, of murder in the second degree, and imposing a sentence of 25 years to life, reversed, on the law and the facts, and the matter remanded for a new trial.

We agree with defendant that the court erred in refusing his request for a charge on the affirmative defense of extreme emotional disturbance (Penal Law § 125.25 [1] [a]) at his trial for the death of his common-law wife.

"The extreme emotional disturbance defense requires proof of both subjective and objective elements. The subjective element focuses on the defendant's state of mind at the time of the crime and requires sufficient evidence that the defendant's conduct was actually influenced by an extreme emotional disturbance * * *. This element is generally associated with loss of self-control * * *. The objective element requires proof of a reasonable explanation or excuse for the emotional disturbance" (*People v Harris*, 95 NY2d 316, 319 [citations omitted]). To be entitled to such a charge, a court must determine that sufficient evidence has been presented for the jury to find, by a preponderance of the evidence, that the subjective and objective elements have been established (*id.*). In considering whether the extreme emotional disturbance defense should have been charged, the evidence must be viewed in the light most favorable to the defendant (*id.*, at 320).

Here, there is sufficient evidence from which a jury could conclude that defendant lost self-control. In fact, the People argued during summation that defendant "snapped" and killed his wife in a "frenzied" "fit of rage." The source of the rage was the contentious and volatile relationship between defendant and his wife, which was characterized by her repeated "yelling," "berating" and "making demands" of defendant. There is proof that on the day of the murder, she had been out until the early morning the previous night, she had made a number of demands, which required defendant to walk up and down the stairs to their fifth floor walk-up apartment, and that she yelled at and berated him during a heated argument. The People also argued that the slashes the wife sustained in the face showed "deep seated passionate emotion."

Although the People "concede that the use of the words 'frenzy' and 'frenzied' * * * was more suggestive of loss of self-control" and was "perhaps justified by the forensic evidence showing that defendant had attacked [his wife] ferociously,"

they argue defendant's conduct was influenced by anger. Whether defendant acted out of anger as the People argue now, or out of loss of self-control as they argued in summation, is for the jury to decide in determining whether to accept or reject the affirmative defense of extreme emotional disturbance (*see, id.*, at 321).

As to the second element, a jury could conclude that the wife's treatment of defendant was sufficiently abusive so as to make his emotional disturbance reasonable.

The medical expert called by defendant, a medical examiner from another New York jurisdiction, did not testify that the wounds found on the deceased were not characteristic of those found in a case where there had been a prior relationship between victim and stabber, as the dissent reads her testimony. She testified that they were equally consistent with cases involving a prior relationship and those involving a stranger as stabber. The dissent also relies heavily on defendant's actions after the death of the victim. While these actions are relevant, they are but some among the many items of evidence to be considered by the jurors. Actions taking place after the occurrence cannot foreclose a jury from considering the defendant's mental state at the time of the actions leading to the death of the decedent.

A new trial with proper jury instructions is required. Concur—Rosenberger, J. P., Nardelli, Andrias and Ellerin, JJ.

Tom, J., dissents in a memorandum as follows: Insofar as I conclude that, on the basis of this record, the trial court properly refused to give the charge of the affirmative defense of extreme emotional disturbance, I respectfully dissent. I find no basis to dispute that defendant, the killer, might have been emotional when he killed Lillian Rivera, his girlfriend. But I find no basis to conclude that his emotional state was so severely disturbed as set forth under prevailing law that he should have been able to avail himself of the defense at trial. Hence, I would affirm the judgment of conviction.

The People's witnesses included Gilberto Franco and his mother, Norma Ruiz, who lived in the apartment beneath the one shared by defendant and Rivera. The neighbors of this six-story walk-up building were acquainted with defendant and Rivera. Franco testified that he often heard defendant and Rivera arguing, and that people entered their apartment at all times of the day and night. On December 13, 1991, Franco heard them fighting again, after which defendant told Franco that he was "tired," he wanted to leave Rivera, that he needed a "better place to live," and that Rivera was "killing herself

with drugs." On December 20, 1991, Ruiz saw them arguing in the hallway. Rivera, who was cursing, was particularly loud. During the afternoon of December 27, 1991, Franco saw defendant, who appeared to be "serious," and Rivera, who seemed "very angry," again arguing in the hallway. From Franco's apartment, he heard the argument continuing upstairs for another half hour, terminating with what sounded like breaking glass. As Franco left his apartment about 45 minutes later, he saw defendant on the staircase carrying a brown paper bag. Defendant, who asked Franco to call the police, said that his "crazy" wife had killed herself. Franco made the call and then went to defendant's apartment where he saw defendant again, now exiting his apartment. They both headed downstairs but defendant stopped to converse with someone. Franco, joined by a friend downstairs, went back up to defendant's apartment where they observed a lot of blood. Franco again saw defendant, now exiting a room with a duffel bag. Defendant explained that he had to remove items from the apartment because "the police [were] going to check it out," that he was going to his sister's house, and that he would be back to talk to the police.

Police Officer Frank Cosentino testified that he responded to a report of a possible suicide. He observed a trail of blood from the living room through the hallway into the kitchen, where he found Rivera's body in the vicinity of a lot of blood. Cosentino and responding Detectives Donald Barto and Benjamin Cretaro found a candle sconce and a figurine on the living room floor, and blood on a couch, love seat, coffee table, end table and the floor nearby. Blood smears on the walls appeared to be hand marks. Rivera apparently had been stabbed several times in the face, neck, chest, arms and hands. The detectives concluded that she had not committed suicide.

Meanwhile, defendant accompanied a woman to Sheila Bassnight's apartment in a building adjacent to defendant's, where he met Phillip Bell, whom he did not know. Defendant took off two sweaters, looking inside before he turned them inside out, and, while snorting heroin, nervously told them that "Mama" was cut up and dead. Later, while smoking crack with Bell in a different room of the apartment, defendant told Bell that "Mama" had been "going crazy," "tearing up the apartment," that she was dead on the kitchen floor and "I did it." As he was leaving Bassnight's apartment, he mused in concern that police might find his photo in his apartment and asked Bassnight to keep a newly arrived guest out of sight so as not to see defendant as he left. Defendant then went to his sister's

apartment. He told an in-law, from whom he borrowed a pair of socks to replace the ones he threw in the garbage (no blood was found on them during a subsequent examination), that Rivera had committed suicide, but later told his sister that during an argument, he hit Rivera and thought she was dead. Later that evening, defendant voluntarily went to the precinct where, obviously nervous and agitated, he declared "my wife killed herself. I want to find out who did this." *Miranda* warnings were quickly administered and defendant provided a written statement in which he related numerous inconsequential details of their interactions that afternoon. He claimed that he left the apartment to do errands for Rivera, upon his return he found her body in the kitchen, after which he ran out yelling "Mama killed herself," and told a neighbor to call the police. His details of what transpired thereafter differed in many respects from the testimony of the People's witnesses.

The Medical Examiner's report indicated that Rivera had received 23 wounds caused by a sharp object, three of which were deeply penetrating and fatal stab wounds inflicted by a 5-inch blade, with others representing slashes. The Medical Examiner ruled out suicide. Defendant's medical expert testified on direct examination that the victim's wounds were consistent with those of a murder by a stranger and on cross the expert also testified that the wounds could have been caused by someone who had a prior relationship with the deceased.

We need not detain ourselves with questions of reasonable doubt, in that evidence of defendant's guilt was overwhelming. The only issue is whether a reasonable view of the evidence manifested an objective, or, indeed, even a subjective, explanation to support defendant's alleged loss of self-control so as to mitigate, if accepted by the jury, the charge of murder and warrant a reduction to manslaughter in the first degree. Defendant has failed to provide any such evidence. Moreover, the clear and consistent evidence of defendant's conduct prior to, and following, the killing eviscerates any claim of mitigation and compels a negative answer to this question.

Penal Law § 125.25 (1) (a) states that it is an affirmative defense to a charge of murder in the second degree if "defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." As is apparent from the statutory language, the affirmative defense requires a two-part analysis. First, there is the subjective ele-

ment in which the defendant must show that he or she did actually act under the influence of an extreme emotional disturbance at the time of the crime. Second, an objective component of the analysis must be proved—that there was a reasonable explanation or excuse for the emotional disturbance and that the proven disturbance was a reasonable response to circumstances as they were perceived by the defendant, however inaccurate that perception may have been (*see, People v Harris*, 95 NY2d 316, 319; *People v Moye*, 66 NY2d 887, 890; *cf., People v Walker*, 64 NY2d 741). The statutory goal is not to assess legal sufficiency or weight of the evidence of the underlying crime; rather, it "requires mitigation to be afforded an emotionally disturbed defendant only when the trier of fact, after considering a broad range of mitigating circumstances, believes that such leniency is justified" (*People v Casassa*, 49 NY2d 668, 681, *cert denied* 449 US 842). The burden rests on the defendant to establish the affirmative defense by a preponderance of the evidence (Penal Law § 25.00 [2]; *People v Braun*, 199 AD2d 993, *lv denied* 83 NY2d 849; *People v Harris*, 109 AD2d 351, 361-362, *lv denied* 66 NY2d 919).

In order to establish the subjective component of the defense of extreme emotional disturbance, the defendant must offer evidence to show that he lost self-control "due to mental trauma or exposure to extremely unusual and overwhelming stress" (*People v Irizarry*, 199 AD2d 180, 181, *lv denied* 83 NY2d 872, citing *People v Patterson*, 39 NY2d 288, 302-303, *affd* 432 US 197). The Court of Appeals has described the loss of self-control as "indicative of [a] 'mental infirmity', not rising to the level of insanity" (*Walker, supra*, at 743). Absent evidence of such a loss of self-control, there is no sound basis upon which to ground the affirmative defense so that, if submitted, the jury is left with only speculative endeavors.

In the case at bar, defendant's defense at trial was, consistently, that he did not kill the victim. Consistent with this defense, no testimony was elicited to explain what trauma, if any, motivated him to kill her against which to evaluate the affirmative defense.

The Court of Appeals has noted that "[i]t is established New York case law that a defendant's entitlement to a charge on a claimed defense is not defeated solely by reason of its inconsistency with some other defense raised or even with the defendant's outright denial that he was involved in the crime" (*People v Butts*, 72 NY2d 746, 748, and cases cited therein), a general rule which has also been applied to affirmative defenses (*id.*, at 749 [affirmative defense of entrapment]). However,

the Court of Appeals has also recognized that a "defendant's repeated claims of innocence necessarily impact[s] upon the sufficiency of the evidence offered to demonstrate that he acted under the influence of extreme emotional disturbance at the time of the homicide" (*People v White*, 79 NY2d 900, 903). Hence, "[t]he critical question * * * [is] not whether the claimed defense was consistent with the defendant's testimony or with other defenses raised, but whether that defense, viewed separately, was supported by the trial evidence. The rule is that the jury must be instructed on all claimed defenses which are supported by a *reasonable view* of the evidence—not by any view of the evidence, however artificial or irrational" (*Butts, supra*, at 750). Here, defendant's proof was that he and Rivera had an argumentative and volatile relationship, and that on the day of the murder they had a heated argument, had discussed that Rivera had been out until the early morning the previous night and that she had demanded that defendant run several errands. This proof falls far short of that needed to establish that defendant, due to a traumatic event, lost self-control. Further, Franco testified that the couple's arguing was fairly routine and that on the day of the crime he had heard the couple arguing loudly but he was "already getting used" to it. The fact that defendant and the victim had another loud and angry argument just immediately before the crime established at most that defendant may have been angry with the victim, and murdered her.

In this regard, killing on the basis of anger or embarrassment, even if brutally done, does not equate with a loss of self-control (*People v Basso*, 140 AD2d 448, 450; *accord, People v Deresky*, 137 AD2d 704, 705, *lv denied* 71 NY2d 1025; *People v Murden*, 190 AD2d 822, *lv denied* 81 NY2d 1017; *People v Knights*, 109 AD2d 910). As the Court of Appeals has noted, charging the affirmative defense under circumstances where the evidence only shows a long-standing disagreement coupled with some provocative behavior by the victim would only have "invited the jury to impermissibly speculate as to the defendant's state of mind at the time of the shooting" (*Walker, supra*, at 743). In *White* (*supra*, at 903), the "defense [could] not be inferred from the provocative act itself." We have reached a similar conclusion, that in the absence of actual evidence evincing more than mere anger, submitting the affirmative defense was in error since any jury finding in this respect would be pure speculation (*People v Felix*, 232 AD2d 228, *lv denied* 89 NY2d 864). Anger, in particular, has proved to be an insufficient reason to submit the charge (*People v Binkley*, 278 AD2d 124, *lv denied* 96 NY2d 756; *accord, People v Feris*, 144 AD2d

691), even when the dispute is protracted (*People v Hayes*, 223 AD2d 602, *lv denied* 88 NY2d 879; *Walker, supra*), or the killing is particularly brutal (*Murden, supra* [defendant, after altercation with girlfriend over living arrangements, stabbed her 19 times]; *accord, Knights, supra* [husband stabbed wife 26 times]), or the dispute was provoked by the victim's own violent conduct (*People v Reeves*, 163 AD2d 590, *lv denied* 76 NY2d 943 [victim sprayed defendant in face with mace; defendant returns minutes later to shoot him]), or when the defendant acts as a consequence of a long standing anger over a wife's "immoral behavior" (*Knights, supra,* at 911). As the court recognized in *Knights*, "[a]t most, this evidence demonstrated that defendant acted out of anger; though a strong emotion, it is not one generally indicative of the loss of self-control associated with" the affirmative defense (*id.*). We have also previously rejected violent responses to insults as reasonable excuses for the defendant's conduct (*People v Gonzalez*, 249 AD2d 41, *lv denied* 92 NY2d 847, 1049; *People v Pagan*, 210 AD2d 126, *lv denied* 85 NY2d 912).

Although the majority seems to fill in defendant's evidentiary gap with the trial prosecutor's reference during summation that defendant "snapped," such commentary, of course, is not evidence. Nor do the summation characterizations in the aggregate even approach the exacting standards required by case law. In any event, the majority's summary of the proof evinces no more than that defendant was angry with an apparently difficult paramour. This does not provide a basis upon which the trial court would have been required to submit the instruction.

Courts also may evaluate a defendant's conduct prior or subsequent to the killing in deciding whether the defense is to be submitted. For instance, leaving the crime scene, concealing the weapon or otherwise seeking to evade detection or capture would be inconsistent with the loss of self-control associated with extreme emotional disturbance (*People v Dominguez*, 226 AD2d 391, *lv denied* 89 NY2d 921). In *Murden (supra)*, where the defendant denied remembering stabbing his girlfriend 19 times as the outcome of a dispute over living arrangements, evidence of difficulties in their relationship did not constitute the requisite reasonable excuse, even if accentuated by possible intoxication, and his behavior before and after the killing was inconsistent with the loss of self-control associated with the affirmative defense, conclusions reached by the Third Department under analogous circumstances (*Knights, supra*).

Defendant's behavior after the murder was not indicative of

the loss of self-control. In fact, immediately after the murder, defendant appeared to be in full control as he cleaned himself, methodically removed things from the apartment, stopped to converse with neighbors shortly after the killing, then socialized, while ingesting drugs, during which he obviously tried to evade police detection. Then, he went to his sister's apartment where he undertook additional evasive behavior, all the while, indicating that "Mama" had committed suicide. All of these factors, on the basis of well-established case law, militate against a finding of any reasonable view of the evidence warranting the instruction.

The majority seems to infer from the fact and the violent nature of the killing that the jury could have inferred such a "reasonable explanation or excuse," but how such an inference upon an inference is to be securely grounded in the actual, concrete evidence remains unexplained in the majority writing. Stated differently, while a jury might infer from a proffered excuse why there was a violent killing, and evaluate whether the excuse is or is not reasonable (*cf.*, *e.g.*, *Moye, supra*; *Harris, supra*), the statute does not allow an inference based merely from the fact and nature of the killing that there is a reasonable excuse. The fact of excessive violence does not correlate with the assumption of an objectively explained loss of self-control. Nor, logically, would the statute allow such an analysis; otherwise, the affirmative defense, rather than being an exceptional vehicle for mitigation in an exceptional case involving extraordinary emotional tumult, would be the routine defense in every case characterized by anger and violence.

The fact of 23 wounds does not change this analysis. Otherwise, where does one draw the line—at 15 wounds but not 23, or seven wounds but not eight? Notably, the fact of multiple stab wounds occasioned by great anger was insufficient to warrant the defense in *Murden (supra)* and *Knights (supra)*, cases articulating a greater relationship between those defendants' mental states and particular conduct than the present case.

The majority's analysis, conversely, allows a jury to assume a reasonable explanation—without a scintilla of testimony that there was an explanation and in the face of the consistent defense that defendant did not even do the stabbing—on the basis that there was an argument and defendant stabbed the victim many times. This, I believe, is not authorized by the statute and sets an alarming precedent.

Accordingly, I respectfully disagree with my colleagues and would affirm.